# In re S-K-, Respondent

*Decided June 8, 2006*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) The statutory language of section 212(a)(3)(B) of the Immigration and Nationality Act, 8 U.S.C.A. § 1182(a)(3)(B) (West 2005), does not allow a "totality of the circumstances" test to be employed in determining whether an organization is engaged in terrorist activity, so factors such as an organization's purposes or goals and the nature of the regime that the organization opposes may not be considered.

(2) Neither an alien's intent in making a donation to a terrorist organization nor the intended use of the donation by the recipient is considered in assessing whether the alien provided "material support" to a terrorist organization under section 212(a)(3)(B)(iv)(VI) of the Act.

(3) The respondent's contribution of S$1100 (Singapore dollars) over an 11-month period to the Chin National Front was sufficiently substantial to constitute material support to an organization, which despite its democratic goals and use of force only in self-defense, is defined by statute as a terrorist organization acting against the Government of Burma, so the respondent is barred from asylum and withholding of removal.

FOR RESPONDENT: Edward Neufville III, Esquire, Baltimore, Maryland

AMICI CURIAE:[1] James Feroli, Esquire, Alexandria, Virginia; Thomas Hutchins, Esquire, Alexandria, Virginia; Annigje J. Buwalda, Esquire, Fairfax, Virginia

FOR THE DEPARTMENT OF HOMELAND SECURITY: Stephen M. Ruhle, Assistant Chief Counsel; David Landau, Chief Appellate Counsel

BEFORE: Board Panel: FILPPU and PAULEY, Board Members. Concurring Opinion: OSUNA, Acting Vice Chairman.

PAULEY, Board Member:

In a decision dated February 2, 2005, an Immigration Judge found the respondent removable as charged and denied her applications for asylum, withholding of removal, and protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR

---

[1] We acknowledge the very helpful briefs submitted by the parties and by amici curiae, participating members of the Immigrant and Refugee Appellate Center and supporting groups.

Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture"). The respondent appealed that decision and her request for oral argument was granted pursuant to 8 C.F.R. § 1003.1(e)(7) (2006). The respondent's appeal will be sustained in part and dismissed in part.

## I. FACTUAL AND PROCEDURAL HISTORY

The respondent, a native and citizen of Burma, is a Christian and an ethnic Chin. According to the respondent, she faces persecution and/or torture if returned to Burma because the Government, currently a military dictatorship ruled by the majority Burman ethnic group, regularly commits human rights abuses against ethnic and religious minorities and, in fact, arrested and detained both the respondent's brother and fiancé, the latter ultimately being killed by the military.

In 2001, the respondent became acquainted with an undercover agent for the Chin National Front ("CNF") who was a friend of her deceased fiancé. She became sympathetic to the CNF's goal of securing freedom for ethnic Chin people and donated money to the organization for approximately 11 months. In addition, she attempted to donate some other goods, such as a camera and binoculars, to the CNF, but they were confiscated after she had given them to the undercover agent. The agent informed the respondent that she should flee Burma because the Burmese military, known to torture anyone affiliated with the CNF, had seen a letter written by the respondent to the CNF; the military knew that the respondent was the person who had attempted to provide the material goods. The respondent was actually residing in Singapore at the time, but since her temporary work visa was about to expire and she could not return to Burma, she fled to the United States in order to request asylum.

Although the Immigration Judge found that the respondent had established a well-founded fear of persecution in order to qualify for asylum, he denied her application for relief because, by providing money and other support to the CNF, an organization which uses land mines and engages in armed conflict with the Burmese Government, the respondent provided material support to an organization or group of individuals who she knew, or had reason to know, uses firearms and explosives to endanger the safety of others or to cause substantial property damage. Therefore, she was statutorily barred from asylum and from withholding of removal under either section 241(b)(3) of the Immigration and Nationality Act, 8 U.S.C.A. § 1231(b)(3) (West 2005), or the Convention Against Torture. *See* sections 208(b)(2)(A)(v), 212(a)(3)(B)(i)(I), (iii)(V), (iv)(VI)(bb) of the Act, 8 U.S.C.A. §§ 1158(b)(2)(A)(v), 1182(a)(3)(B)(i)(I), (iii)(V), (iv)(VI)(bb) (West 2005); *see also* sections 237(a)(4)(B), 241(b)(3)(B)(iv) of the Act, 8 U.S.C.A.

§§ 1227(a)(4)(B), 1231(b)(3)(B)(iv) (West 2005); 8 C.F.R. § 1208.16(d)(2) (2006). However, the Immigration Judge also found that because of the speculative nature of the respondent's information regarding what the Burmese military knows about her, she had failed to meet her burden of establishing a clear probability of persecution or torture and, for this additional reason, he denied her applications for withholding of removal under section 241(b)(3) of the Act, and for protection under the Convention Against Torture.

Both parties submitted briefs on appeal, and two amici curiae briefs were filed on the respondent's behalf. We granted the respondent's request for oral argument in order for the parties to address what we viewed as the major questions arising in the case: (1) what standards or definition should be used to assess whether the term "material support" should be defined narrowly or more broadly; whether it should take into consideration the mens rea of the provider, as proposed by the respondent; and whether it includes the type of support provided by the respondent to the CNF;[2] and (2) to what extent, in light of our precedent, we should factor in an organization's purpose and goals in order to assess whether an organization, like the CNF, is engaged in terrorist activity. In other words, we asked the parties to address whether the use of justifiable force against an illegitimate regime and the right of people to self-determination, which the respondent argues is the CNF's purpose, is a valid purpose, which would not fall within the definition of terrorist activity under the Act. We will address these issues in reverse order.

## II. ANALYSIS

### A. Terrorist Organization

During oral argument and on appeal, the respondent argued that the Burmese Government is not legitimate because the military junta rules the country under martial law and crushes any attempts at democratic reform. According to the respondent, the United States does not recognize the Burmese Government's legislative acts, and therefore the CNF's actions are not unlawful under Burmese law. Rather, she asserts, the organization's actions are similar to those of forces fighting the Taliban in Afghanistan or forces rebelling against Saddam Hussein in Iraq, which are supported by the

---

[2] We also raised the question whether the terrorism bar for providing material assistance includes mere attempts to provide assistance, since some of the provisions donated by the respondent to the CNF had been confiscated prior to delivery. While an interesting question, we find it unnecessary to decide that issue now, because the respondent clearly did provide monetary assistance to the CNF.

United States. Its goals are democracy and it uses force only in self-defense. Moreover, the CNF is allied with the National League of Democracy, which the United States has recognized as a legitimate representative of the Burmese people and is recognized by the United Nations. Therefore, the respondent contends that the Immigration Judge erred in concluding that the CNF is a terrorist organization. *See* section 212(a)(3)(B)(iii) of the Act (requiring that terrorist activity must be unlawful under the laws of the place where it is committed or under the laws of the United States).[3]

Whether the CNF's actions are lawful in Burma is a question of foreign law and is a factual issue on which the respondent bears the burden of proof, inasmuch as the "evidence indicates" that the terrorism bar to asylum may apply. *See* 8 C.F.R. § 1240.8(d) (2006); *see also Abdille v. Ashcroft*, 242 F.3d 477 (3d Cir. 2001); *Matter of Annang*, 14 I&N Dec. 502 (BIA 1973). In other words, the Department of Homeland Security ("DHS") satisfied its burden of establishing that the evidence "indicated" that an asylum bar applied, and under the regulation the burden of proof has shifted to the respondent to show by a preponderance of the evidence that the bar is inapplicable.

During oral argument, the respondent pointed to testimony from the Assistant Secretary of State describing the Burmese military as a "group of thugs," as well as to the fact that the United States Government has passed the Burmese Freedom and Democracy Act of 2003, Pub. L. No. 108-61, 117 Stat. 864, acknowledging that the National League of Democracy is the legitimate representative of the Burmese people. In addition, in response to a Department of State ("DOS") request for information, the Resource Information Center ("RIC"), a branch of the asylum division in the United States Citizenship and Immigration Services of the DHS, indicated that it had no information about whether the CNF had engaged in terrorist activities.

---

[3] Subsequent to oral argument, the respondent submitted a motion to supplement in which she asserts that it is significant that Congress chose the term "unlawful" in section 212(a)(3)(B)(iii) of the Act, rather than the term "illegal." Relying on the distinction between the words "lawful," which implies an ethical content, and "legal," which denotes compliance with technical rules, the respondent claims that actions of the CNF against the Burmese Government should not be considered unlawful because they are merely outlawed by the repressive regime, rather than inherently wrong. *See Black's Law Dictionary* 885 (6th ed. 1990).

However, the terms "unlawful" and "illegal" are both defined by *Black's Law Dictionary* as against, contrary to, or unauthorized by law. *Id.* at 747, 1536. Therefore, the fact that Congress chose to use the term "illegal" in some parts of the Act, does not, in our view, provide support for the respondent's argument, inasmuch as there is no indication by Congress that either term was meant to exclude morally repugnant laws. Consequently, we are not convinced that Congress intended different meanings for the terms "unlawful" and "illegal."

As pointed out by the DHS during oral argument, the RIC did not necessarily take into consideration the definition of terrorist activities in the Act when drafting its response to the DOS's request for information. Furthermore, the respondent acknowledged, upon questioning, that the United States does maintain a diplomatic relationship with the Burmese Government and maintains an embassy there. Therefore, in some sense or degree, the United States recognizes as legitimate the Burmese Government, which appears to consider the activities of the CNF unlawful.

Although the respondent urges us to determine that the Burmese Government is illegitimate and argues that we have such authority, we are unable to agree with the respondent's argument. While there may have been cases in which we determined that certain acts by foreign governments were unlawful in terms of harming individuals who sought asylum here, we have not gone so far as to determine that a foreign sovereignty would not be recognized by the United States Government. Such a determination is beyond our delegated authority and is a matter left to elected and other high-level officials in this country.

Furthermore, the respondent cites to past case law interpreting asylum applicants' claims and granting relief where aliens have attempted to overthrow governments that do not allow citizens to change the political structure and therefore exercise illegitimate power when prosecuting such individuals. In other words, she asserts that the motivation of the group seeking to effect change in a country must be analyzed in order to determine whether the harm produced is persecution or, as claimed in this case, terrorist activity. *See Matter of Izatula*, 20 I&N Dec. 149 (BIA 1990) (holding, in a case involving an alien who actively assisted the mujahedin in Afghanistan, that the general rule that prosecution for an attempt to overthrow a lawfully constituted government does not constitute persecution is inapplicable in countries where a coup is the only means of effectuating political change); *Matter of Rodriguez-Majano*, 19 I&N Dec. 811 (BIA 1988) (holding that an alien who had involuntarily helped the guerrillas in El Salvador was not barred from asylum for having participated in the persecution of others, because harm that may result incidentally from behavior aimed at another goal, e.g., the overthrow of a government or the defense of a government against an opponent, particularly in the context of civil war, is not directed at overcoming a belief or characteristic of those persecuted). During oral argument, counsel for the respondent acknowledged that by utilizing such factors to determine whether an organization falls within section 212(a)(3) of the Act, he was advocating that we apply a "totality of the circumstances" test.

We are unable to find any support for the respondent's assertion that such a test should be utilized. Our past case law is not inconsistent with some of the respondent's arguments. However, that case law does not address the bar

to relief in section 212(a)(3)(B)(i)(I) of the Act. In this case, we are dealing with specific statutory language, which we read as applying to the respondent. *See Singh-Kaur v. Ashcroft*, 385 F.3d 293 (3d Cir. 2004).

As noted by the DHS during oral argument, the fact that Congress included exceptions elsewhere in the Act for serious nonpolitical offenses and aliens who have persecuted others, even where persecuted themselves, and that it has not done so in section 212(a)(3)(B), indicates that the omission of an exception for justifiable force was intentional. In fact, having reviewed the statutory sections, we find that Congress intentionally drafted the terrorist bars to relief very broadly, to include even those people described as "freedom fighters," and it did not intend to give us discretion to create exceptions for members of organizations to which our Government might be sympathetic. Rather, Congress attempted to balance the harsh provisions set forth in the Act with a waiver, but it only granted the power to make exemptions to the Attorney General and the Secretaries of State and Homeland Security, who have not delegated such power to the Immigration Judges or the Board of Immigration Appeals.[4] *See* REAL ID Act of 2005, Div. B of Pub. L. No. 109-13, §§ 103(b), 104, 119 Stat. 231, 302, 307-09 ("REAL ID Act") (eliminating with immediate effect the waiver provision formerly found at section 212(a)(3)(b)(iv) of the Act and creating a new, revised waiver at section 212(d)(3)).

In sum, we find no error in the Immigration Judge's conclusion that the CNF is a terrorist organization within the definition of the Act. Contrary to the respondent's assertions on appeal and during oral argument, there is no exception in the Act to the bar to relief in cases involving the use of justifiable force to repel attacks by forces of an illegitimate regime. As noted by the Immigration Judge, there was sufficient evidence in the record to conclude that the CNF uses firearms and/or explosives to engage in combat with the Burmese military, and the respondent has not provided evidence that would rebut this conclusion or lead us to interpret the Act differently. Moreover, the record shows that the respondent knew or should have known of the CNF's

---

[4] While we need not decide the issue, we do tend to agree with the DHS's assertion during oral argument that the new waiver provisions apply to this case. Furthermore, although this provision lacks an express effective date, we believe it unlikely that Congress intended to create a gap in which there would be no waiver available for asylum cases pending prior to the effective date of the REAL ID Act.

use of arms.[5] Thus, assuming the respondent provided material support to the CNF, her sole remedy to extricate herself from the statutory bar appears to lie in the waiver afforded by Congress for this purpose, for which the DHS stated at oral argument she is eligible to apply.[6] However, the Immigration Judges and the Board have no role in the adjudication of such a waiver.

## B. Materiality of Support Provided

The respondent also argues that the type and amount of support which she provided to the CNF was not material. She asserts that the Immigration Judge failed to take into consideration whether the funds and goods she provided were relevant to the planning or implementation of a terrorist act, as allegedly required by the United States Court of Appeals for the Third Circuit in *Singh-Kaur v. Ashcroft*, *supra*, at 13-16. Since no evidence was submitted to support a conclusion that the respondent's contributions were relevant to a specific terrorist goal, the respondent asserts that finding that her contributions were material goes against congressional intent to tie materiality to terrorist activity. In support of her argument, the respondent has attached an advisory opinion from the United Nations High Commissioner for Refugees ("UNHCR") to her counsel, which indicates that materiality must be assessed in conjunction with the alien's claim of persecution and the question whether or not the alien presents a present or future danger to the security of the United States.[7] Advisory opinion of Kolude Doherty, Regional Representative,

---

[5] Indeed, section 212(a)(3)(b)(iv)(VI)(dd) of the Act provides that it is the respondent's burden to demonstrate a lack of such knowledge or a reasonable failure to know by "clear and convincing evidence." *See* REAL ID Act, § 103(b), 119 Stat. at 307. This provision is applicable to the instant proceedings. *Id.* § 103(d), 119 Stat. at 308-09.

[6] The concurring opinion, while agreeing with our construction of the Act, finds the result lamentable. We note that the ultimate outcome of the respondent's case is still undetermined in light of her ability to apply for a waiver. *See infra* note 14. In any event, we regard our responsibility as confined to the application and interpretation of the statutes we administer, and we will not opine as to the wisdom of the scheme Congress has enacted.

[7] Implicit in the UNHCR's advisory opinion is the assertion that our holding, which would (apart from the possibility of a waiver) bar asylum to this alien and possibly future aliens who have been or will be persecuted, conflicts with international law, which must be interpreted alongside and consistently, where possible, with our domestic laws. It is also well established that Congress may enact statutes that conflict with international law. *See, e.g.*, *Guaylupa-Moya v. Gonzales*, 423 F.3d 121, 133-34 (2d Cir. 2005); *United States v. Yousef*, 327 F.3d 56, 93 (2d Cir. 2003). However, we are not convinced that it was the intent of Congress to do so here. While it is clear that our government leaders have taken

United Nations High Commissioner for Refugees, to Edward Neufville III, Esq. (June 15, 2005).

Section 212(a)(3)(B)(iv)(VI) of the Act states that "material support" includes "a safe house, transportation, communication, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training." The UNHCR advisory opinion correctly asserts that the term "material support" is not completely defined and that while the list of examples following the term provides some clarification regarding its scope, its meaning remains somewhat ambiguous. The advisory opinion goes on to state that when assessing the scope of the term, one must look at the regularity and amount of funds or goods/services provided and determine whether they are sufficiently serious to warrant exclusion. It concludes that denial of relief is only warranted where the alien constitutes a present or future danger to the security of the United States.

We are unaware of any legislative history which indicates a limitation on the definition of the term "material support." Nor do we understand the decision in *Singh-Kaur v . Ashcroft*, *supra*, to require a showing of an intent on the part of a provider of material support to further a particular admission-barring or asylum-barring goal of a terrorist organization.[8] Rather, the statute is clearly drafted in this respect to require only that the provider afford material support to a terrorist organization, with the sole exception being a showing by clear and convincing evidence that the actor did not know, and should not

---

a strict approach to dealing with suspected terrorists and have attempted to make it more difficult for those involved in terrorism to gain relief of any kind, they also have expressly provided a waiver that may be exercised in cases where the result reached under the terrorist bars to relief would not be consistent with our international treaty obligations or where, as a matter of discretion, the Secretary of State or the Secretary of Homeland Security determines that the facts of a specific case warrant such relief. *See* REAL ID Act § 104, 119 Stat. at 309 (setting forth the waiver provision to be found at section 212(d)(3)(B) of the Act). Accordingly, while the Immigration Judges and the Board do not have the authority to grant the respondent or similarly situated aliens a discretionary waiver, other officials, including the Secretary of State, prior to the instigation of removal proceedings, or the Secretary of Homeland Security, at any time upon consultation with other agency officials, have been granted this power. We find no reason to assume they will not act consistently with our international treaty obligations in exercising their power to grant such a waiver.

[8]  *Singh-Kaur v. Ashcroft*, *supra*, did not decide this question, as the case concerned the provision of material support to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity. Indeed, it was the dissenting judge who predicated his separate opinion on a ground similar to the respondent's assertion here. *Singh-Kaur v. Ashcroft*, *supra*, at 301 (Fisher, J., dissenting).

reasonably have known, that the organization was of that character. Section 212(a)(3)(B)(iv)(VI)(dd) of the Act. We thus reject the respondent's assertion that there must be a link between the provision of material support to a terrorist organization and the intended use by that recipient organization of the assistance to further a terrorist activity. Especially where assistance as fungible as money is concerned, such a link would not be in keeping with the purpose of the material support provision, as it would enable a terrorist organization to solicit funds for an ostensibly benign purpose, and then transfer other equivalent funds in its possession to promote its terrorist activities.

We turn then to the respondent's claim that the statute's requirement of material support means that trivial or unsubstantial amounts of assistance, such as she allegedly provided, are not within the statutory bar.[9] In *Singh-Kaur v. Ashcroft*, *supra*, the Third Circuit found that the provision of very modest amounts of food and shelter to individuals who the alien reasonably should have known had committed or planned to commit terrorist activity did constitute material support.[10] The court also found that the listed examples in section 212(a)(3)(B)(iv)(VI) of the Act were not exhaustive but were "intended to illustrate a broad concept rather than narrowly circumscribe a term with exclusive categories." *Id.* at 298.

In addition, the court rejected the alien's arguments that because a similar statute criminalizing such support to terrorists included a longer list of examples, including lodging, congressional intent was to limit the types of support that would qualify to those listed. *Singh-Kaur v. Ashcroft*, *supra*, at 298-99. The court noted that the two statutes were enacted at different times by different Congresses and that "it would be incongruous to conclude that a person who provides food and sets up tents for terrorists could be jailed for up to life under 18 U.S.C. section 2339A, but the same conduct could not prohibit admission to the United States under INA section 212." *Id.* at 299.

---

[9] A common dictionary definition of the word "material" includes such terms as substantial, noticeable, of importance, and relevant. *See, e.g.*, *Webster's II New College Dictionary* 675 (1995).

[10] While *Singh-Kaur v. Ashcroft*, *supra*, is not controlling because this case falls within the jurisdiction of the Fifth Circuit, which apparently has not yet issued a precedent decision on this subject, we do find it highly persuasive. We disagree with the respondent's contention that *Singh-Kaur* is distinguishable from this case because the organization at issue in that case was a designated terrorist organization. The Act does not make a distinction between designated terrorist organizations and those which are found to be terrorist organizations under section 212(a)(3)(B)(vi)(III) of the Act.

As the DHS contends, it is certainly plausible, in light of the decision in *Singh-Kaur v. Ashcroft*, *supra*, and recent amendments to the Act,[11] that the list in section 212(a)(3)(B) was intended to have an expanded reach and cover virtually all forms of assistance, even small monetary contributions.[12] Congress has not expressly indicated its intent to provide an exception for contributions which are de minimis. Thus the DHS asserts that the term "material support" is effectively a term of art and that all the listed types of assistance are covered, irrespective of any showing that they are independently "material."

On the other hand, the respondent's contrary argument that "material" should be given independent content is by no means frivolous. However, we find it unnecessary to resolve this issue now, inasmuch as we agree with the DHS that based on the amount of money the respondent provided, her donations of S$1100 (Singapore dollars) constituted material support.[13] Specifically, the respondent testified that she contributed approximately S$100 per month over an 11-month period, representing approximately one-eighth of her monthly income. This was sufficiently substantial by itself to have some effect on the ability of the CNF to accomplish its goals, whether

---

[11] The definition of "material support" was amended recently in 2001 in order to add the term "transfer of funds or *other* material financial benefit." *See* Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Pub. L. No. 107-56, § 411, 115 Stat. 272, 345-47 (emphasis added) (codified at section 212(a)(3)(B)(iv)(VI) of the Act). Last year Congress again amended the immigration laws to provide for greater restrictions on asylum applicants, particularly terrorists who seek to abuse the asylum process. *See* REAL ID Act § 103(b), 119 Stat. at 306-07.

[12] As noted by the Seventh Circuit in a decision construing civil liability for providing material support to a terrorist organization, "Congress' goal of cutting off funding for terrorism would be seriously compromised if terrorist organizations could avoid liability by simply pooling together small donations to fund a terrorist act." *Boim v. Quranic Literary Inst.*, 291 F.3d 1000, 1015 (7th Cir. 2002). As stated elsewhere in this opinion, we need not resolve this issue today; however, we point out that the Seventh Circuit was not addressing whether very small monetary contributions barred asylum to an alien with a well-founded fear of persecution.

[13] We take administrative notice that this corresponded at the time to approximately US$685. *See Rivera-Cruz v. INS*, 948 F.2d 962 (5th Cir. 1991) (noting that we may take administrative notice of commonly acknowledged facts); *see also, e.g.*, www.cnnmoney.com; www.ratesfx.com. By contrast, the average annual per capita income in Burma was approximately US$225. *See* Bureau of East Asian and Pacific Affairs, U.S. Dep't of State, *Background Note: Burma* (Aug. 2005), *available at* www.state.gov/r/pa/ei/bgn/35910.htm.

in the form of purchasing weaponry or providing routine supplies to its forces, for example. We therefore agree with the Immigration Judge that the respondent provided material support to the CNF.

## III.  CONCLUSION

Based on the foregoing, we agree with the Immigration Judge's decision that the respondent is statutorily ineligible for asylum and withholding of removal for having provided material support to a terrorist organization. The respondent's appeal will therefore be dismissed in part regarding her applications for that relief. However, during oral argument, the DHS conceded that the respondent is eligible for deferral of removal under the Convention Against Torture.[14] We agree and will therefore sustain the respondent's appeal and vacate the Immigration Judge's decision in that regard. The record will be remanded for the appropriate background checks to be updated.

**ORDER:** The respondent's appeal from the Immigration Judge's decision denying her applications for asylum and withholding of removal is dismissed.

**FURTHER ORDER:** The respondent's appeal from the Immigration Judge's decision denying her application for deferral of removal under the Convention Against Torture is sustained and the decision of the Immigration Judge is vacated in part.

**FURTHER ORDER:** Pursuant to 8 C.F.R. § 1003.1(d)(6), the record is remanded to the Immigration Judge for the purpose of allowing the Department of Homeland Security the opportunity to complete or update identity, law enforcement, or security investigations or examinations, for further proceedings, if necessary, and for the entry of an order as provided by 8 C.F.R. § 1003.47(h). *See* Background and Security Investigations in Proceedings Before Immigration Judges and the Board of Immigration Appeals, 70 Fed. Reg. 4743, 4752-54 (Jan. 31, 2005).


*CONCURRING OPINION*: Juan P. Osuna, Acting Vice Chairman

I join the majority's decision. I agree with the majority that the Immigration Judge properly denied the respondent's applications for asylum and withholding of removal, as this result is compelled by the specific language

---

[14] We note that the DHS also indicated that once granted deferral of removal under the Convention Against Torture, the respondent may be eligible for a section 212(d)(3) waiver to the material support bar.

of the statute. I write separately because I have considerable doubts that this result is what Congress had in mind when it enacted the "material support" bar to asylum.

We are finding that a Christian member of the ethnic Chin minority in Burma, who clearly has a well-founded fear of being persecuted by one of the more repressive governments in the world, one that the United States Government views as illegitimate, is ineligible to avail herself of asylum in the United States despite posing no threat to the security of this country. It may be, as the majority states, that Congress intended the material support bar to apply very broadly. However, when the bar is applied to cases such as this, it is difficult to conclude that this is what Congress intended.

Unfortunately, there is virtually no legislative history that accompanies the material support bar. We therefore have nothing to examine to determine congressional intent, beyond the statutory language itself. And that language mandates that we bar this respondent from asylum.

The respondent clearly faces persecution in her home country. The Immigration Judge found her credible. He also found that the respondent has a well-founded fear of persecution due to her imputed political opinion. The Immigration Judge denied asylum, however, after finding that the respondent was barred from establishing eligibility because she is inadmissible under section 212(a)(3)(B)(i)(I) of the Immigration and Nationality Act, 8 U.S.C.A. § 1182(a)(3)(B)(i)(I) (West 2005), for having "engaged in a terrorist activity." Under the Act, to "engage in terrorist activity" includes committing an act the actor knows, or reasonably should know, affords "material support" to, among others, a designated terrorist organization or to "a group of two or more individuals, whether organized or not," which engages in any of a number of activities, including the use of an "explosive, firearm, or other weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property." Sections 212(a)(3)(B)(iii)(V), (iv)(VI), (vi)(III) of the Act. The organization that the respondent provided support to, the Chin National Front ("CNF"), has an armed wing that is resisting the Government of Burma. The CNF is allied with the National League of Democracy, which is recognized by the United States as a legitimate representative of the Burmese people.

In enacting the material support bar, Congress was rightly concerned with preventing terrorists and their supporters from exploiting this country's asylum laws. It is unclear, however, how barring this respondent from asylum furthers those goals. The respondent provided funds and some equipment to a member of the CNF, an organization that has *not* been designated by the Department of State as a terrorist organization under section 212(a)(3)(B)(vi) of the Act. The available information in the record indicates that the CNF engages in violence primarily as a means of self-defense against the Burmese

Government, a known human rights abuser that has engaged in systematic persecution of Burmese ethnic minorities, including the Chin Christians. By reference to common definitions of the term "terrorism" and "terrorist," it is doubtful that the CNF would be considered a terrorist organization. *See* 50 U.S.C. § 1801(c) (2000) (defining terrorist acts as those intended to intimidate a civilian population, to influence the policy of a government by intimidation or coercion, or to affect the policy of a government by assassination or kidnapping). Indeed, the Resource Information Center of the Department of Homeland Security ("DHS") reported in February 2004 that there is no information that the CNF has been involved in terrorist activities or in abuses against civilians on any large or systematic scale. CIS Resource Information Center, U.S. Citizenship and Immigration Services, *Burma (Myanmar): Information on the Chin National Front/Chin National Army* (Feb. 26, 2004), *available at* http://www.uscis.gov/graphics/services/asylum/ric/documentation/mmr04001.htm.

The CNF, however, is a group that has resorted to violence in self-defense, including the use of explosives. The Immigration Judge was thus correct to find that the assistance that the respondent provided to the CNF constituted material support to any individual who the respondent knew, or should have known, "has committed or plans to commit a terrorist activity." Section 212(a)(3)(B)(iv)(VI)(bb) of the Act. The fact that this language goes beyond common notions of "terrorism" is immaterial in the context of this case.

Yet, the statutory language is breathtaking in its scope. Any group that has used a weapon for any purpose other than for personal monetary gain can, under this statute, be labeled a terrorist organization. This includes organizations that the United States Government has not thought of as terrorist organizations because their activities coincide with our foreign policy objectives. For example, the DHS conceded at oral argument that an individual who assisted the Northern Alliance in Afghanistan against the Taliban in the 1990s would be considered to have provided "material assistance" to a terrorist organization under this statute and thus would be barred from asylum. This despite the fact that the Northern Alliance was an organization supported by the United States in its struggle against a regime that the United States and the vast majority of governments around the world viewed as illegitimate.

It also includes groups and organizations that are not normally thought of as "terrorists" per se. Read literally, the definition includes, for example, a group of individuals discharging a weapon in an abandoned house, thus causing "substantial damage to property." Section 212(a)(3)(B)(iii)(V) of the Act. This may constitute inappropriate or even criminal behavior, but it is not what we normally think of as "terrorist" activity. *See McAllister v. Attorney General*, 444 F.3d 178 (3d Cir. 2006) (stating that the definition of terrorist

activity in section 212(a)(3)(B) of the Act encompasses more conduct than our society, and perhaps even Congress, has come to associate with traditional acts of terrorism); *see also id.* at 191 (Barry, J., concurring) (noting that the definition of terrorist activity "sweeps in not only the big guy, but also the little guy who poses no risk to anyone").[15]

The broad reach of the material support bar becomes even starker when viewed in light of the nature of the Burmese regime, and how it is regarded by the United States Government. In 2003, Congress passed the Burmese Freedom and Democracy Act of 2003, Pub. L. No. 108-61, 117 Stat. 864, which, among other things, imposes sanctions on the Burmese Government as a result of its deplorable human rights record. The Secretary of State has designated Burma as one of a handful of "countries of particular concern" in light of this record, including its treatment of ethnic and religious minorities. Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Burma - International Religious Freedom Report 2003* (Dec. 18, 2003) *available at* http://www.state.gov/g/drl/rls/irf/2003/23823.htm. In particular, the Burmese Government has engaged in arrests of Christian clergy, destruction of churches, prohibition of religious services and proselytizing by Christians, and forced conversions of Christians. *Id.* These efforts are part of a larger effort to "Burmanize" the Chin ethnic minority. *See* Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Country Reports for Human Rights Practices - 2005 (Mar. 2006)*, *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61603.htm (noting that the Burmese Government's "human rights record worsened during the year, and the government continued to commit numerous serious abuses"); President George W. Bush, State of the Union Address (Jan. 31, 2006) (listing Burma, along with Syria, Zimbabwe, North Korea and Iran, as countries that deny freedom and democracy to their citizens).

The United States Commission on International Religious Freedom notes that "[s]erious human rights abuses perpetuated by Burma's military regime

---

[15] Amici suggest that the material support definition could include members of organized armed forces, even those of the United States. For example, as the Jubilee Campaign and Christian Legal Society note in their amicus brief, the Iraqi national who provided information to United States Marines that led to the rescue of Private Jessica Lynch in 2003 could also be deemed to have provided "material support" under section 212(a)(3)(B)(iv)(VI) of the Act. It is unclear whether that specific example would be deemed to fall under the scope of the material support bar, in light of the requirement under the statute that the act must be unlawful under the laws of the place where it is committed, or under the laws of the United States. However, amici raise a valid point about the broad scope of the material support bar, which, in certain instances, could potentially bar from relief those who provide assistance to United States or allied armed forces.

continue to be widespread, including systematic and egregious violations of religious freedom." Annual Report of the United States Commission on International Religious Freedom 103 (May 2006), *available at* http://www.uscirf.org/countries/publications/currentreport/2006annualRpt.pdf#page=1.[16] The Commission adds that members of religious groups, including Chin Christians, continue to face "serious abuses of religious freedom and other human rights" by the Burmese military, including forced conscription, destruction of churches, restrictions on construction of churches, forced conversions and other abuses. *Id.* at 103-05.

In sum, what we have in this case is an individual who provided a relatively small amount of support to an organization that opposes one of the most repressive governments in the world, a government that is not recognized by the United States as legitimate and that has engaged in a brutal campaign against ethnic minorities. It is clear that the respondent poses no danger whatsoever to the national security of the United States. Indeed, by supporting the CNF in its resistance to the Burmese junta, it is arguable that the respondent actually acted in a manner consistent with United States foreign policy. And yet we cannot ignore the clear language that Congress chose in the material support provisions; the statute that we are required to apply mandates that we find the respondent ineligible for asylum for having provided material support to a terrorist organization.

Accordingly, I concur in the majority's result. I note, however, that the law provides for a limited waiver of the material support bar to be exercised by the DHS in appropriate cases. Section 212(d)(3) of the Act. I suggest that the DHS may wish to consider this respondent as someone to whom the grant of such a waiver is appropriate.

---

[16] We are permitted to take administrative notice of the contents of official documents. 8 C.F.R. § 1003.1(d)(3)(iv) (2006).