HAMILTON, Circuit Judge,
concurring in part and concurring in the judgment.
I agree that Jabateh’s petition should be denied and that the Board lacked jurisdiction to review Jabateh’s “section 13” application. See 8 U.S.C. § 1255b. I would deny the rest of his petition on the merits. That would require only a straightforward application of our deferential standard of review to factual findings. Jabateh simply did not prove that if he returns to Liberia, he faces persecution based on his religion, ethnicity, or any other protected ground, or that he faces a likelihood of torture. Deciding the case on these grounds would avoid the difficult “material support of terrorism” issue. See INS v. Bagamasbad, 429 U.S. 24, 25, 97 S.Ct. 200, 50 L.Ed.2d 190 (1976) (courts and agencies are generally not required to make findings on issues not needed to support result).
Since my colleagues reach the issue of “material support of terrorism,” I should explain my disagreement with their view and my agreement with the immigration judge. The occasional translation services Jabateh provided during Conneh’s medical appointments and a few unspecified social occasions did not amount to “material support” of terrorism. LURD qualifies as a so-called Tier III terrorist organization, see 8 U.S.C. § 1182(a)(3)(B)(vi)(III), one not formally designated as such. I will assume for purposes of argument that Ja-bateh’s translation services provided “support” to a member of that organization. Through a chain of statutory definitions, that translation support can amount to “terrorist activity.” See 8 U.S.C. § 1182(a)(3). I agree with the immigration judge that Jabateh’s sporadic and largely unpaid “support” in the form of personal translation for Conneh was not “material.”
Aliens who have provided material support to a terrorist organization or a member of a terrorist organization are not eligible for important forms of immigration relief, including asylum, withholding of removal, and protection under the Convention Against Torture. See 8 U.S.C. § 1158(b)(2)(A)(v) (ineligible for asylum); 8 U.S.C. § 1231(b)(3)(B)(iv) (ineligible for withholding of removal); 8 C.F.R. § 1208.16(d)(2) (ineligible for .withholding under Convention Against Torture); but see 8 C.F.R. § 1208.17(a) (eligible for deferral of removal under Convention Against Torture); Khan v. Holder, 766 F.3d 689, 698 (7th Cir. 2014) (eligible for deferral of removal under Convention Against Torture after showing “that the alien will be tortured by the government or with its acquiescence”) (emphasis in original).
The Board’s and the majority’s broad construction of the statutory phrase “material support” effectively reads “material” out of the statute. It also fails to take account of the broader structure of the Immigration and Nationality Act. Under the broad reading we may well bar people we should be welcoming to the United States, people who have managed to escape some of the most chaotic and dangerous places in the world.
To begin with the statutory text, the critical language is buried in 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd), which is a clause of a definition of “engage in terrorist activity”:
*344 As used in this chapter, the term “engage in terrorist activity” means, in an individual capacity or as a member of an organization — to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training — to a terrorist organization described in [8 U.S.C. § 1182(a)(3)(B)(vi)(III) ], or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.
Under this definition, a prohibited form of “support” for Conneh, who was a member and leader of LURD, can amount to support for terrorism — if it was “material support.”
The Board and majority reason in essence that the statutory list includes “communications” as a form of “material support” and that translation between languages is a form of communications, so Jabateh’s sporadic and largely unpaid help for Conneh with translation at his medical appointments amounted to material support for terrorism. Also, because the support need not be tied directly to terrorist acts, Hussain v. Mukasey, 518 F.3d 534, 538 (7th Cir. 2008), the Board and majority reason that supporting Conneh in his personal endeavors meets the material support bar.
This reasoning seems to me a little too mechanical and sweeps too broadly. It loses sight of two key principles of statutory interpretation: first, avoid interpretations that reduce some statutory terms to sur-plusage (here, “material”), and second, interpret statutory language with an eye toward its broader statutory context and purpose. See, e.g., Williams v. Taylor, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); King v. Burwell, 576 U.S.-, -, 135 S.Ct. 2480, 2489,192 L.Ed.2d 483 (2015); Antonin Scalia and Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167, 174 (2012) (“whole-text” and “surplusage” canons).
“Material” is a common term in federal law. It conveys some sense of both importance and relevance. For example, misrepresentations or omissions concerning issuance, purchase, or sale of securities may be unlawful if they are “material” but not if they are immaterial. See, e.g., 15 U.S.C. §§ 77k and 77l; 17 C.F.R. § 240.10b-5. Criminal fraud, such as in the federal statutes on mail, wire, bank, and tax fraud and fraud on the government, requires that the deception be “material.” See Neder v. United States, 527 U.S. 1, 16, 22-25, 119 S.Ct. 1827,144 L.Ed.2d 35 (1999).
The standard for materiality is not always high, but it does exist. It calls for courts and agencies to distinguish the minor from the material. In fraud cases, it requires that the deception involve something that has “a natural tendency to influence” or is “capable of influencing” the relevant decision. Id. at 16, 119 S.Ct. 1827, quoting United States v. Gaudin, 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), quoting in turn Kungys v. United States, 485 U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988); see also TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (“An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.”). In fraud cases, materiality filters out the trivial or minor. See TSC Industries, 426 U.S. at 463, 96 S.Ct. 2126 (reversing summary *345 judgment for plaintiff; omissions not material, at least as a matter of law, so materiality presented factual dispute).
In other statutory contexts, materiality requirements are even more substantial. For instance, the False Claims Act uses a similar definition of material: “having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.” 31 U.S.C. § 3729(b)(4). The Supreme Court recently said that this “materiality standard is demanding.” Universal Health Services, Inc. v. United States ex rel. Escobar, 579 U.S. -, -, 136 S.Ct. 1989, 2003, 195 L.Ed.2d 348 (2016) (materiality requirement not met when violation is “minor or insubstantial”).
In Universal Health Services, the Court also pointed out the broader use of materiality in the common law. In tort law, a matter is material only “(1) ‘[if] a reasonable man would attach importance to [it] in determining his choice of action in the transaction’; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter ‘in determining his choice of action,’ even though a reasonable person would not.” Id., citing Restatement (Second) of Torts § 538, at 80. Similarly, in contract law, a common and important issue is whether a party’s breach is “material,” which may excuse the other party from further performance. See generally Restatement (Second) of Contracts §§ 237 and 241; Canada Dry Corp. v. Nehi Beverage Co., 723 F.2d 512, 517 & n.3 (7th Cir. 1983).
Materiality also plays important roles in constitutional law. For instance, the Fourteenth Amendment’s Due Process Clause forbids prosecutors from failing to disclose “material” exculpatory evidence. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1964). Omitted evidence is “material” when it “creates a reasonable doubt that did not otherwise exist.” United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (finding no Brady violation, in part, because undisclosed evidence was not “material”); see also Harris v. Thompson, 698 F.3d 609, 627-28 (7th Cir. 2012) (Brady standard of materiality applies to compulsory process clause).
While the precise meaning of “material” depends on its context, it always has the effect of raising the threshold of the word it modifies. In all of these contexts, courts make clear that the word must be reckoned with. In fact, when “material” modifies a statutory term, it is often regarded as an express “requirement.” See, e.g., United States v. Seidling, 737 F.3d 1155, 1158, 1160 (7th Cir. 2013) (discussing mail fraud statute’s “materiality requirement” or “materiality element”).
When the materiality requirement is absent from a statute, the Supreme Court takes notice and enforces the unmodified statutory term more literally.[1] The Court has used this approach with the Immigration and Nationality Act itself. In Kungys v. United States, the Court reviewed 8 U.S.C. § 1101(f)(6), which states that a person will not be considered of good moral character if she has “given false testimony for the purpose of obtaining benefits under this chapter.” The Court held that the false testimony provision did not contain an implicit materiality requirement:
*346 On its face, § 1101(f)(6) does not distinguish between material and immaterial misrepresentations. Literally read, it denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits. We think it means precisely what it says.
Kungys, 485 U.S. at 779-80, 108 S.Ct. 1537. If the absence of the word “material” has such a significant impact in the Immigration and Naturalization Act, then its presence must mean something.
This approach is further bolstered by the statute’s examples of material support, which are all activities that advance the goals of terrorism. They include providing “a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training.” § 1182(a)(3)(B)(iv)(VI); see also Singh-Kaur v. Ashcroft, 385 F.3d 293, 304 (3d Cir. 2004) (Fisher, J., dissenting) (arguing that “material” requires the support to be “relevant to the specified terrorist goal, terrorist persons, or terrorist organizations, which in sum means that the support must be relevant to terrorism”). These examples reinforce the plain-language reading that support is “material” when it is relevant to advancing terrorism.
At times the Board has considered whether Congress intended to include a “de minimis” exception in the “material support” bar but has left this question unanswered. See, e.g., In re S-K-, 23 I. & N. Dec. 936, 945 (BIA 2006). With respect, this is the wrong question. Congress included a materiality requirement in the statute. The question that the Board and we should be asking is about the scope of that requirement.
The reader of the majority opinion can fairly ask whether its approach leaves any meaning for the word “material,” at least if it treats as material support of terrorism Jabateh’s occasional and largely unpaid translation for a leader’s medical appointments and a few other unspecified social errands. Cf. In re ***, 2009 WL 9133770 (BIA 2009) (non-precedential) (finding support for terrorist organization was not material where it consisted of about four dollars and a packed lunch, and distinguishing In re S-K-, where petitioner donated about $685 over eleven months to non-terrorist activities of group).
The majority’s approach also loses sight of important signals from the statutory context and purpose of the “material support” bar. The INA was amended in 1990 to bar certain forms of immigration relief to those engaged in terrorist activities. See Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990). This provision has been amended several times since then, most notably in the PATRIOT Act and the REAL ID Act. See USA PATRIOT Act, Pub. L. No. 107-56, § 411, 115 Stat. 272 (2001); REAL ID Act of 2005, Pub. L. 109-13, § 103, 119 Stat. 243, 306 (2005).
The INA strikes a balance of sorts for handling asylum-seekers who come from parts of the world where terrorist organizations are active or even ascendant. It tries to distinguish between those who perpetrate terror and those who suffer from it. We bar the former. 8 U.S.C. § 1182(a)(3)(B). We offer asylum and CAT protection to at least some of the latter. § 1158; 8 C.F.R. § 1208.16(c). This sorting creates tension. A door open too wide would admit perpetrators; a closed door would deny deserving asylum-seekers. As the material support bar has been con *347 strued, the door is just barely ajar. The majority’s reading threatens to close it entirely.
The material support bar already encompasses a broad range of groups, people, and activities. Tier I and II terrorist organizations are those officially designated by statute or otherwise. 8 U.S.C. § 1182(a)(3)(B)(vi). Tier III terrorist organizations are other, undesignated groups that prepare for, plan, or commit terrorist activity. § 1182(a)(3)(B)(vi)(III). “Terrorist activity” is defined as “any activity which is unlawful under the laws of the place where it is committed ... and which involves ... [t]he use of any ... explosive, firearm, or other weapon or dangerous device ... with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.” § 1182(a)(3)(B)(iii).
As one Board member put it: “Any group that has used a weapon for any purpose other than for personal monetary gain can, under this statute, be labeled a terrorist organization.” In re S-K-, 23 I. & N. Dec. at 948 (Osuna, concurring) (applying law to Chin National Front, which opposed military dictatorship in Burma that U.S. government had condemned as illegitimate, and where Christian members of Chin minority had well-founded fear of being persecuted by Burmese dictatorship).[2] To call these results surprising is an understatement. For instance,
DHS [has] conceded ... that an individual who assisted the Northern Alliance in Afghanistan against the Taliban in the 1990s would be considered to have provided “material assistance” to a terrorist organization under this statute and thus would be barred from asylum. This despite the fact that the Northern Alliance was an organization supported by the United States in its struggle against a regime that the United States and the vast majority of governments around the world viewed as illegitimate.
Id. This broad definition could bar Syrians who provided support to those opposing the current Assad regime before fleeing their county. See Theodoric Meyer, U.S. Is Arming Syrian Rebels, But Refugees Who’ve Aided Them Are Considered Terrorists, ProPublica, https://www. propublica.org/article/us-is-arming-syrian-rebels-refugees-whove-aided-them-considered-rterrorists (Sept. 30, 2013) (U.S. Citizenship and Immigration Services stated that “any Syrians who do apply for refugee or asylum status could be subject” to the material support bar). This is remarkable, given that the United States itself has supported select Syrian opposition groups. See Carla E. Humud et al, Congressional Research Service, Armed Conflict in Syria: Overview and U.S. Response 20-27 (2016).
As noted, we have interpreted the material support bar to include support for a terrorist organization’s non-terrorist activities. See Hussain v. Mukasey, 518 F.3d 534, 538 (7th Cir. 2008) (“If you provide material support to a terrorist organization, you are engaged in terrorist activity even if your support is confined to the nonterrorist activities of the organization.”); accord, In re S-K-, 23 I. & N. Dec. at 943-44. This is because some forms of support' like money are fungible. Such support to a terrorist organization’s non-ter *348 rorist activities frees up resources for its terrorist activities. In re S-K-, 23 I. & N. Dec. at 944. In addition, this type of support, even though not directly supporting terrorist acts, may bolster a terrorist organization by giving it greater legitimacy or influence. Many terrorist organizations “operate on two tracks: a violent one and a peaceful one (electioneering, charity, provision of social services). If you give money (or raise money to be given) for the teaching of arithmetic to children in an elementary school run by [a terrorist organization], you are providing material support to a terrorist organization even though you are not providing direct support to any terrorist acts.” Hussain, 518 F.3d at 538.
In addition, duress does not seem to be an available defense for an asylum-seeker who provided material support to a terrorist or terrorist organization. See Matter of M-H-Z, 26 I. & N. Dec. 757, 760 (BIA 2016) (collecting cases from several circuits). People who are threatened or coerced by terrorists into providing material support will likely be barred from immigration relief.
As Board Vice Chair Osuna wrote in his concurrence in In re S-K-, therefore, “the statutory language is breathtaking in its scope.” 23 I. & N. Dec. at 948. For example, the government took the position at oral argument in this case that the material support bar would apply to a doctor or nurse who provided emergency medical care to a person she “should have known” was affiliated with a group that uses violence. Given the Board’s approach to duress in M-H-Z, the bar would apply even if she provided the medical care at gunpoint. Really?
If the Board and the courts apply the material support bar so broadly to non-terrorist activities and even to support provided under duress, it is especially important to give meaning to the statutory limit of “material.” That term calls for immigration judges, the Board, and the courts to strike a balance written into the Act. It does so by preventing application of the bar to people arriving in the United States from some of the most dangerous and chaotic places on earth. They may not have been able to avoid all contact with terrorist groups and their members, but we should not interpret the statute to exclude on this basis those who did not provide “material” support to them.
Many deserving asylum-seekers could be barred otherwise. For example, the grocer who sells groceries to a known rebel fighter who is shopping for dinner would be providing support to terrorism. The taxi driver, the plumber, the dentist — anyone who has even minor commercial contact with a known terrorist, even in a setting that does not advance the goals of a terrorist organization — has supported terrorism. This broad approach could bar people simply because the places they have escaped from are ones where terrorists were active. Congress opted against that blanket approach.
At oral argument the government attempted to minimize this concern by raising the possibility of discretionary relief under 8 U.S.C, § 1182(d)(3)(B). Such relief is possible, and DHS has issued several group-based and situational-based exemptions under this provision. See, e.g., supra at 347 n.2 (group-based exemptions for Chin groups); Exercise of Auth. Under Sec. 212(d)(3)(B)(i) of the Immigration and Nationality Act, 79 Fed. Reg. 6913 (Feb. 5, 2014) (permitting limited exemptions for “insignificant material support” of terrorism).
The possibility of discretionary relief elsewhere in the statute does not change the plain language of the statute. We do not read the “materiality” requirement out of the criminal fraud statutes because *349 there is the possibility of a presidential pardon. Nor should we do so here. “Material” should have some meaning. Also, as a practical matter due to the way § 1182(d)(3)(B) has been implemented, some applicants are precluded from even being considered for this form of discretionary relief and most will receive no judicial review of that decision.[3]
To back its broad reading of “material support,” the majority also relies on the Supreme Court’s interpretation of that phrase in Holder v. Humanitarian Law Project, 561 U.S. 1, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010). Ante at 341. That decision makes clear that truly material support for terrorism can include support for non-terrorist activities of terrorist organizations, but it did not address any issue of the minimal limits to materiality. The Court wrote.that “‘Material support’ is a valuable resource by definition.” 561 U.S. at 30, 130 S.Ct. 2705. The value that Jaba-teh’s translation services for Conneh’s medical appointments and other social matters might have had to LURD’s terrorist activities is not at all clear. Indeed, Jabateh was generally unpaid, only occasionally receiving “a few dollars, a few francs,” App. at 12 n.5.
The challenging question is of course what level of support meets the threshold of materiality. Identifying the “material” floor may be difficult, but such is the nature of judicial line-drawing. See Bank of Markazi v. Peterson, 578 U.S.-,-, 136 S.Ct. 1310, 1336, 194 L.Ed.2d 463 (2016) (Roberts, C.J., dissenting) (“I readily concede, without embarrassment, that it can sometimes be difficult to draw the line between legislative and judicial power.”). The statute’s use of the word “material” requires such a line. As we review specific immigration cases such as Jabateh’s, just as in fraud cases, we should not shy away from this judicial task. See also Basic Inc. v. Levinson, 485 U.S. 224, 236 n.14, 108 S.Ct. 978, 99 L.Ed.2d 194 (agreeing that “materiality concept is judgmental in nature and it is not possible to translate this into a numerical formula” and should be assessed on a “case-by-case basis”).
In Jabateh’s case, three key factors lead me to find that the Board erred by holding his “support” ■ was “material.” First, and most important, .Jabateh provided a very *350 small amount of support. The translation service was sporadic and generally unpaid. App. 18. The arrangement appears to have been rather ad hoc: Jabateh was “called in sometimes” between 2001 and 2002 to translate during doctor appointments and social errands. Id. This went on “Just a few months.” Id. at 13 n.6.
Second, Jabateh provided support only for Conneh’s personal, non-terrorist activities. Jabateh testified, and the immigration judge found him credible, that he never interpreted for Conneh’s business meetings or any events involving LURD. Id. at 12, 18. He was not translating battle commands, communicating with LURD confederates, or recruiting new members. Nor did he carry weapons or provide security for Conneh. Id. Also, the type of “support” he provided — translation during Conneh’s personal outings — is not fungible like money, nor did it bolster LURD’s legitimacy or influence.
Third, Jabateh provided translation services to a member of LURD, not to the organization itself. If Jabateh had been translating for LURD itself, even in LURD’s non-terrorist capacity (such as a charitable arm of the organization), there would be a stronger case to consider the support “material.” In such a case, his support might have been more relevant to advancing the goals of terrorism.
Here, the combination of these three factors leads me to conclude that the immigration judge was right and the Board erred by finding Jabateh’s support was material. He provided a small amount of non-fungible services to a Tier III terrorist member in only his personal non-terrorist activities. If we treat that as material support of terrorism, we may bar too many people from dangerous parts of the world who had only minimal contact with the terrorist organizations in their midst. It would bar the doctor, nurse, grocer, taxicab driver, plumber, and dentist. That result is not consistent with the statute.

. At times the Supreme Court has read an implicit materiality requirement into a statute that does not expressly contain one. For instance, when a statute contains a term with a well-established meaning in the common law, the Supreme Court turns to the history of the term to see if it contains an implicit materiality requirement. See Neder, 527 U.S. at 20-23, 119 S.Ct. 1827.

. While the broader precedent of In re S-K-still stands, its application to the Chin National Front was later modified. In 2007, then-Secretary of Homeland Security Chertoff exercised his discretionary authority to create limited exemptions for the Chin National Front, the Chin National Army, and the Chin League for Democracy. See Exercise of Auth. Under Sec. 212(d)(3)(B)(i) of the Immigration and Nationality Act, 72 Fed. Reg. 9957 (Mar. 6, 2007).

. In FH-T v. Holder, 723 F.3d 833 (7th Cir. 2013), we addressed why some petitioners are precluded from relief under § 1182(d)(3)(B). DHS will consider an exemption only for a petitioner who has been deemed "otherwise eligible” for immigration relief. See id. at 843, citing U.S. Citizenship and Immigration Services, Fact Sheet (Oct. 23, 2008). As a result, if the Board affirms an immigration judge’s . finding that a petitioner is barred due to material support of terrorism but does not proceed to address the merits, DHS will not consider an exemption. It’s a catch-22: the petitioner may be "unable to seek a waiver [from DHS] because no final finding of asylum eligibility ‘but . for the bar’ has been issued [by BIA], and unable to receive a full adjudication of asylum eligibility [from BIA] on the basis that he is subject to the material support bar.” Id. at 843; see also FH-T v. Holder, 743 F.3d 1077 (7th Cir. 2014) (Wood, C.J., dissenting from denial of rehearing en banc).
Congress "expressly provided for federal judicial review over exemption determinations," 723 F.3d at 847, yet many petitioners will be precluded from receiving this review due to interagency timing problems. This is because DHS will consider providing an exemption only after an order of final removal. The Board’s removal order, however, triggers a 30-day window for the .petitioner to seek federal judicial review. Since “it is unlikely that Congress intended DHS waiver decisions themselves to constitute separately reviewable decisions,” we noted that the "current agency practices will in all likelihood frustrate the opportunity for review because the Board decisions will issue more quickly than DHS exemptions (and the period for appealing a removal order will otherwise lapse).” Id. at 847-48.