In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1112

NASSUMA FOMBA JABATEH,

*Petitioner*,

*v.*

LORETTA E. LYNCH, Attorney
General of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A099-075-385

ARGUED SEPTEMBER 13, 2016 — DECIDED JANUARY 5, 2017

Before BAUER, KANNE, and HAMILTON, *Circuit Judges.*

BAUER, *Circuit Judge.* Petitioner Nassuma Fomba Jabateh, a native and citizen of Liberia, filed a petition with this Court seeking to vacate an order from the Board of Immigration Appeals that denied his applications for asylum and withholding of removal under 8 U.S.C. § 1231(b)(3) and the Convention Against Torture, 8 C.F.R. § 1208.16(c). Petitioner's applications were denied on the basis that he had provided material

support to the Tier III terrorist organization Liberians United for Reconciliation and Democracy, and thus was rendered ineligible for any form of relief. Alternatively, the BIA also denied his applications on the merits. Further, the BIA denied Petitioner's request for deferral of removal under CAT, because he failed to show that it was more likely than not he would be tortured if returned to Liberia, and Petitioner challenges that conclusion. Last, Petitioner seeks review of the BIA's conclusion that it was jurisdictionally barred from reviewing his application for an adjustment of status. For the reasons that follow, we affirm the BIA's decision.

## I. BACKGROUND

### A. Factual Background

A civil war engulfed Liberia from 1989 to 1997, claiming the lives of 200,000 people and displacing a million others into refugee camps in neighboring countries. A government official named Charles Taylor led a band of rebels known as the National Patriotic Front in invading Liberia from the Ivory Coast at the outset of the war. On July 14, 1989, Taylor's rebels attacked Petitioner's hometown of Barkedu and massacred fifty-eight Mandingo Muslims, including Petitioner's brother, Abu Jabateh. On this same date, Petitioner was exiled to Guinea, where he stayed until 2003. The war ended in 1997 with a peace agreement and the election of Taylor to the presidency.

In July 1999, Liberian exiles formed the military and political organization Liberians United for Reconciliation and Democracy in response to dissatisfaction with the implementation of the 1997 peace agreement. LURD consisted mostly of

Mandingos and Krahns, ethnic groups from northern Liberia that fought Taylor during the civil war. The group's primary objective was to remove Taylor from office. LURD's leader was Sekou Conneh, a former Guinean tax collector with close connections to the group's financial backers and the president of Guinea.

In mid-2000, a civil war once again erupted in Liberia. LURD launched military operations from across the border in Guinea in order to unseat Taylor. The war had a religious undertone in that LURD forces were largely Mandingo Muslims, while government troops were mostly animists and Christians. LURD forces failed to stop criminal behavior by insurgents, such as raping and looting. The forces raped a young woman in front of her husband and children after she was accused of supporting the government. They also reportedly abducted Liberian refugees in Sierra Leone and forced them to haul weapons and goods under threat of injury or death. Those who complained of exhaustion, thirst, or hunger were shot and left to bleed to death.

While Petitioner lived in Guinea, he became close with Conneh, the head of LURD. Conneh asked Petitioner to interpret for him at doctor appointments and social activities because Petitioner spoke French. Petitioner would sometimes receive monetary compensation for his services, which he provided to Conneh. He acknowledges that he was aware of LURD's status as an armed insurgent group, and that the group was connected in some way to the Guinean government. After returning to Liberia in 2003, Petitioner had no further contact with Conneh. That same year, representatives from Taylor's government, LURD, and a second insurgent group

negotiated a peace treaty, which became effective on August 18, 2003. This treaty gave LURD control over several governmental departments; Taylor resigned his post as president and was exiled in Nigeria.

In September 2003, Petitioner was appointed to serve as Liberia's Director of the Bureau of National Procurement; several subordinate employees resigned because they did not wish to work for a Mandingo Muslim. In addition, he received anonymous phone calls in which the callers threatened to do everything possible to remove him from his position.

Most alarmingly, Petitioner's home was burned down by a large mob as part of a tribal and religious land dispute in October 2004. The mob was largely comprised of members of Taylor's dissolved National Patriotic Front. Petitioner claims that the homes of several other Mandingo Muslim government officials also were burned down on the same day, and Petitioner believed that they were targeted because of their status as Mandingo Muslims. Sometime later, Petitioner's office was raided and computers were stolen.

Petitioner entered the United States on May 7, 2005, on an A-2 visa, a nonimmigrant visa that allows foreign officials to enter the country to engage in official duties or activities on behalf of their national government. Petitioner continued to serve as director of National Procurement. The purpose of his visit was to arrange for the purchase of stationery, office furniture, and equipment.

### B. Procedural Background

A month after his arrival, Petitioner filed an affirmative application for asylum. Petitioner contended that he was eligible for asylum and withholding of removal because he suffered past persecution and fears future persecution on account of his status as a Mandingo Muslim, as well as his political opinion and membership in a particular social group—"Mandingo Muslims who are governmental officials." He also contended that he was eligible for CAT protection because it was more likely than not that he would be subjected to torture with the consent or acquiescence of the Liberian government.

On May 23, 2008, an asylum officer found no basis to grant Petitioner's application, and referred his case to Immigration Court. DHS issued a Notice to Appear to Petitioner, charging him with removability under 8 U.S.C. § 1227(a)(1)(C)(i), as an alien who failed to maintain nonimmigrant status. Petitioner conceded his removability.

On July 16, 2009, Petitioner applied for an adjustment of his immigration status, pursuant to § 13 of the Act of September 11, 1957, now codified at 8 U.S.C. § 1255b. An adjustment under § 13 is available to an alien who, having been admitted under §§ 101(a)(15)(A)(i) or (ii) or 101(a)(15)(G)(i) or (ii) of the INA, has performed diplomatic or semi-diplomatic duties, can establish compelling reasons why he or she is unable to return to the country that accredited them as a diplomat, and whose adjustment of status is in the national interest. *See* 8 C.F.R. § 245.3. Petitioner's counsel requested that the Immigration Judge either terminate the proceedings to allow the adjudica-

tion of the petition before the U.S. Citizenship and Immigration Services, or set a hearing date at which point the IJ could consider the adjustment application on the merits prior to his other applications for relief. The government opposed termination, so the IJ scheduled a hearing.

The IJ conducted the hearing on May 6, 2011, during which Petitioner testified in support of his applications for relief. At the close of Petitioner's testimony, the IJ asked the government if it would be willing to terminate the case without prejudice to permit the USCIS to adjudicate Petitioner's application for adjustment of status. The government contended that Petitioner was ineligible for such an adjustment because he provided material support to LURD. The IJ continued the case and ordered briefing from both parties on the issue, and offered Petitioner's counsel an opportunity to file the adjustment application with USCIS.

At the next hearing on April 6, 2012, Petitioner's counsel informed the IJ that Petitioner had not yet received a final decision on his adjustment application. The government anticipated that USCIS would recommend a denial, which it did on April 17, 2012, finding that the record was insufficient to conclude that Petitioner performed diplomatic or semi-diplomatic duties as required by law. Petitioner's counsel agreed not to renew the adjustment application before the IJ, and instead, to defer an appeal of the decision to the BIA, rather than appeal to the USCIS Administrative Appeals Office.

The IJ found that Petitioner's "sporadic, typically unpaid" interpretation services for Conneh did not constitute material

support; nonetheless, the IJ denied Petitioner's applications for asylum and withholding of removal, finding that Petitioner failed to prove past persecution or a well-founded fear of future persecution on a protected ground if he returned to Liberia.

Regarding Petitioner's application for withholding of removal under CAT, the IJ found that Petitioner had not demonstrated that it was "more likely than not" that he would be tortured. Thus, the IJ denied all of Petitioner's applications for relief and ordered him removed. Finally, the IJ found that Petitioner met the statutory requirements for second stage voluntary departure under § 240B of the INA, and granted him 60 days to depart the United States, subject to certain conditions.

Both the government and Petitioner appealed the IJ's decision to the BIA. The government challenged the IJ's grant of voluntary departure, as well as the determination that Petitioner had not provided material support to a terrorist organization. Petitioner challenged the denial of his applications for asylum, withholding of removal, and protection under CAT. He also challenged the IJ's refusal to consider his application for adjustment of status.

First, the BIA disagreed with the IJ on the applicability of the material support bar, finding that the interpretive services provided by Petitioner to Conneh constituted material support. Therefore, the BIA determined that Petitioner was ineligible for asylum or withholding of removal under the INA and CAT. As a result, Petitioner's only possible relief was deferral of

removal under CAT, for which the BIA found that Petitioner failed to qualify.

Alternatively, the BIA affirmed the IJ's ruling on the merits of the asylum and withholding of removal applications, finding that he had failed to prove both past persecution due to a protected ground and a well-founded fear of future persecution. In addition, the BIA concluded that neither the IJ nor the BIA had jurisdiction to consider Petitioner's § 13 application for adjustment of status, as USCIS retained exclusive jurisdiction over such applications.

Last, the BIA found that while Petitioner was statutorily eligible for voluntary departure, he had failed to meet the conditions set forth by the IJ, and therefore the BIA refused to reinstate the voluntary departure period. Petitioner now appeals the BIA's decision.

## II. DISCUSSION

Petitioner raises several arguments on appeal. First, he contends that both the IJ and BIA erred in refusing to consider his § 13 application for adjustment. Next, he argues that the BIA erred in determining that he provided material support to a terrorist organization. In addition, he contends that he is entitled to protection under CAT. He also challenges the BIA's conclusion that he failed to demonstrate both past and future persecution. Finally, he argues that the BIA erred in affirming certain adverse credibility determinations made by the IJ.

"[W]e review the IJ's decision wherever the Board has not supplanted it with its own rationale; where the Board has spoken, we review its opinion." *Sarhan v. Holder*, 658 F.3d 649,

653 (7th Cir. 2011) (citation omitted). "Where … the Board relies on the findings of the IJ but adds its own analysis, we review the IJ's decision as supplemented by the Board's additional reasoning." *Yi Xian Chen v. Holder*, 705 F.3d 624, 628 (7th Cir. 2013) (internal citation omitted). We review agency findings of fact for "substantial evidence" and may reverse the IJ's determinations "only if we determine that the evidence *compels* a different result." *Abraham v. Holder*, 647 F.3d 626, 632 (7th Cir. 2011) (emphasis added) (citing *Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir. 2004)). We review the BIA's legal conclusions *de novo*, and "owe the Board deference in its interpretation of the INA." *Duron-Ortiz v. Holder*, 698 F.3d 523, 526 (7th Cir. 2012) (citation omitted). "Thus, we are not at liberty to overturn the Board's determination simply because we would have decided the case differently." *Bueso-Avila v. Holder*, 663 F.3d 934, 937 (7th Cir. 2011) (quotation marks and citation omitted).

## A. Section 13 Application for Adjustment of Status

Petitioner first argues that the IJ and BIA erred in refusing to consider his § 13 application for adjustment. The BIA concluded that it and the IJ had no jurisdiction to consider Petitioner's § 13 application because no regulation or statute explicitly provided such authority. While this is a matter of first impression for this circuit, the text of the relevant regulations and statutes provides a useful starting point in resolving the issue.

As explained above, an adjustment under § 13 is limited to an alien admitted under §§ 101(a)(15)(A)(i) or (ii) or 101(a)(15)(G)(i) or (ii) of the INA, who has performed diplo-

matic or semi-diplomatic duties, can establish compelling reasons why he or she is unable to return to the country that accredited them as a diplomat, and whose adjustment of status is in the national interest. *See* 8 C.F.R. § 245.3. Here, USCIS determined that Petitioner failed to demonstrate that he had performed diplomatic or semi-diplomatic duties. Rather than appeal to the USCIS AAO, Petitioner sought review before the BIA.

Petitioner argues that under 8 C.F.R. § 1245.2(a)(1)(i), he should have been able to renew his application before the IJ and the BIA because the IJ has exclusive jurisdiction over any application for adjustment of status. However, the regulation that Petitioner relies upon is applicable only to adjustment applications filed pursuant to INA § 245, *see* 8 U.S.C. § 1255, not adjustment applications filed pursuant to § 13, *see* 8 U.S.C. § 1255b. The flaw in Petitioner's argument is his failure to recognize the distinct administrative process in place for § 13 applications.

8 C.F.R. § 245.3 directs § 13 applicants to file their applications with the "director having jurisdiction over the applicant's place of residence." The term "director", as defined in 8 C.F.R. § 1.2, refers to a district director for USCIS. *See Matter of Sesay*, 25 I&N Dec. 431, 432 n.1 (BIA 2011) (noting that USCIS has authority to adjudicate adjustment of status applications); USCIS Adjudicator's Field Manual 23.10(c); *see also Chien-Shih Wang v. Att'y Gen. of United States*, 823 F.2d 1273, 1275 (8th Cir. 1987) (establishing that prior to the transfer of INS functions from DOJ to DHS in 2003, § 13 applications were filed with the INS district director). Therefore, it is clear from the text of the

regulation that the IJ does not have exclusive jurisdiction over § 13 applications.

In support of his argument, Petitioner mistakenly relies upon 8 C.F.R. § 1245.2, which describes the administrative process for INA § 245 applications. Section 1245.2(a)(1)(i) states that "[i]n the case of any alien who has been placed in deportation proceedings or in removal proceedings (other than as an arriving alien), the immigration judge hearing the proceeding has exclusive jurisdiction to adjudicate any application for adjustment of status the alien may file." It is unclear why Petitioner believes this regulation should supplant the one specifically written to govern § 13 applications, but we decline Petitioner's invitation to do so.

Petitioner argues in the alternative that even if the IJ does not have exclusive jurisdiction over § 13 applications in removal proceedings, the IJ and BIA have jurisdiction to review a renewed application in such proceedings. Petitioner cites to the U.S. District Court for the District of Columbia's decision in *Maalouf v. Wiemann*, 654 F. Supp. 2d 6 (D.D.C. 2009), in support of his argument. In *Maalouf*, the court declined to rule on an alien's claim that the AAO violated the Administrative Procedures Act in denying her § 13 application. The court reasoned that the alien, who had since been placed in removal proceedings, could renew her application before the IJ during the removal proceedings, and could appeal an unfavorable decision to the BIA. 654 F. Supp. 2d. at 9.

We note that appellate jurisdiction over § 13 application denials is within the purview of the AAO. *See* USCIS Adjudicator's Field Manual 23.10(f)(4). Prior to the creation of the AAO,

applicants had the right to appeal to a regional commissioner of the INS. *See, e.g.*, *Matter of Aiyer*, 18 I&N Dec. 98 (BIA 1981) (§ 13 application appeal decided by INS Regional Commissioner*); Matter of Vargas*, 14 I&N Dec. 354 (BIA 1973) (same). Aside from the statement in *Maalouf*, we cannot find any support for Petitioner's contention that appeals of § 13 applications are within the purview of the IJ or BIA.

In our view, the *Maalouf* court made the same error as Petitioner in that it conflated the administrative process for adjustment applications under INA § 245 with that of § 13 applications. The two federal circuit court cases that the *Maalouf* court relied upon for the proposition that an unsuccessful applicant for adjustment of status can renew his or her application in immigration proceedings dealt with INA § 245 applications, rather than § 13 applications. *See Pinho v. Gonzales*, 432 F.3d 193, 197 (3d Cir. 2005); *Howell v. INS*, 72 F.3d 288, 289 (2d Cir. 1995). This distinction is crucial.

Under 8 C.F.R. § 245.2(a)(5)(ii), an alien seeking adjustment of status under INA § 245 has "the right to renew his or her application in [removal] proceedings under 8 C.F.R. part 240." However, 8 C.F.R. § 245.3, the regulation relevant to § 13 applications, contains no such statement, and instead applicants are directed to appeal to the AAO, as described above. Therefore, in our view the administrative process for § 13 applications stands in stark contrast to that of INA § 245 applications. This makes sense, given the fact that § 13 is not part of the codified INA. *See* Note, 8 U.S.C. § 1255b. Thus, we are unpersuaded that Petitioner may renew his § 13 application before the IJ or BIA.

The thrust of Petitioner's argument is that the BIA and IJ may exercise jurisdiction over § 13 applications barring any statutory language expressly forbidding it. But this line of argument has been foreclosed by the Supreme Court, which found that "the BIA is simply a regulatory creature of the Attorney General, to which he has delegated much of his authority under the applicable statutes." *INS v. Doherty*, 502 U.S. 314, 327 (1992). The Court held that the Attorney General "is the final administrative authority in construing the regulations, and in deciding questions under them." *Id*.; *see also* 8 C.F.R. § 1003.1(d)(1) ("The Board shall function as an appellate body charged with the review of those administrative adjudications under the Act that the Attorney General may by regulation assign to it."); *id*. § 1003(d)(1)(i) ("The Board shall be governed by the provisions and limitations prescribed by applicable law, regulations, and procedures, and by decisions of the Attorney General[.]"). Petitioner's argument that the IJ and BIA possess any authority not expressly precluded by statute is simply at odds with this clear admonishment from the Court and the express language of the relevant regulations. The Attorney General has spoken unequivocally on this issue—authority to review § 13 applications lies not with IJs or the BIA, but rather with USCIS and its AAO.

Petitioner offers one final argument on this issue: that the BIA's failure to review his § 13 application violated his due process rights. We find this argument unavailing. We have held that an alien "does not have a due process right to seek relief from removal that is purely discretionary, such as adjustment of status, because he has no protected liberty interest in obtaining such relief." *Cadavedo v. Lynch*, 835 F.3d

779, 784 (7th Cir. 2016)(citation omitted). Further, we note that according to the record before us, Petitioner never appealed his application denial to the AAO. Where an applicant has failed to avail himself of the administrative process available to him, we are precluded from considering the argument. *Pjetri v. Gonzales*, 468 F.3d 478, 481 (7th Cir. 2006). Accordingly, we find that the BIA and IJ did not err in refusing to consider Petitioner's § 13 application for adjustment.

### B. Material Support Bar

Petitioner next argues that the BIA erred in determining that he provided material support to a terrorist organization. A portion of the INA provides that any alien who has "engaged in a terrorist activity" is ineligible for admission into the United States. 8 U.S.C. § 1182(a)(3)(B)(i)(I). These aliens are precluded from several forms of relief, including asylum, withholding of removal, and CAT protection in the form of withholding. *See Khan v. Holder*, 766 F.3d 689, 698 (7th Cir. 2014); *see also* 8 U.S.C. § 1158(b)(2)(A)(v) (stating, in effect, that an alien who is inadmissible or deportable on terrorism-related grounds is ineligible for asylum); 8 U.S.C. § 1231(b)(3)(B)(iv) (same for withholding of removal); 8 C.F.R. § 1208.16(d)(2) (same for withholding under CAT); But they remain eligible for deferral of removal under CAT. *See Khan*, 766 F.3d at 698; 8 C.F.R. § 1208.17(a) (directing that aliens eligible for CAT protection but subject to terrorism-related bars be granted deferral of removal).

Under the INA, terrorist activity is defined expansively to include "commit[ting] an act that the actor knows, or reasonably should know, affords material support" to a terrorist

organization. 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). This is commonly referred to as the "material support bar" to relief. The term "material support" includes providing "a safe house, transportation, communications, … material financial benefit, false documentation or identification, weapons [ ], explosives, or training[.]" *Id*.

Terrorist organizations are divided into three tiers: Tier I and II organizations are determined by the Secretary of State and published in the Federal Register, while Tier III organizations are any others that engage in terrorist activities.[1] *Id*. § 1182(a)(3)(B)(vi). If an alien gave material support to a Tier I or Tier II organization, he is barred from entry regardless of whether he knew it was a terrorist organization. *Compare id*. § 1182(a)(3)(B)(iv)(VI)(cc), with (dd). However, if a group is in Tier 3, the alien has an opportunity to "demonstrate by clear and convincing evidence that [he] did not know, and should not reasonably have known, that the organization was a terrorist organization." § 1182(a)(3)(B)(iv)(VI)(dd). This is known as the "knowledge exemption" to the material support bar. *See FH-T v. Holder*, 723 F.3d 833, 839 (7th Cir. 2013).

Here, both the IJ and BIA determined that LURD was a Tier III terrorist organization. Neither party disputes this designation. The BIA further determined that Petitioner's provision of interpreter services to Conneh, LURD's leader, constituted material support under the INA. In this respect, the BIA's decision parted ways with that of the IJ. The BIA also found

---

[1]   Unlike Tiers I and II, the government does not maintain a formal list of organizations falling under Tier III.

that Petitioner failed to prove by clear and convincing evidence that he did not know and should not have known that LURD was a terrorist organization. Consequently, the BIA found that the knowledge exemption did not apply to Petitioner.

On appeal, Petitioner does not challenge the BIA's finding regarding the knowledge exemption. Instead, he argues that the BIA failed to give deference to the IJ's factual and legal determinations. Although we are foreclosed from reviewing the BIA's factual determinations on this issue, *see* 8 U.S.C. § 1158(b)(2)(D), we note in passing that the BIA credited the IJ's factual determinations, but simply came to a different legal conclusion. Petitioner also challenges the BIA's determination that his interpreter services constitute material support under the INA. The government contends that this argument is also unreviewable because it is a factual challenge. However, Petitioner is challenging the finding that his actions with respect to LURD met the legal definition of "material support." Petitioner asserts a quintessential legal error, one which we are entitled to consider. *See Gutierrez v. Lynch*, 834 F.3d 800, 804 (7th Cir. 2016) ("[W]e retain jurisdiction to review questions of law and constitutional claims[.]"); *see also* 8 U.S.C. § 1252(a)(2)(D). However, this is as much traction as his argument gets.

Petitioner contends that the sporadic and infrequent nature of his interpreter services to a LURD member for medical appointments and social errands renders his support beyond the bounds of the material support statute because it occurred outside the context of the group's terrorism-related activities. Yet Petitioner acknowledges that under circuit precedent, an individual may offer material support "even if [the] support is

confined to the nonterrorist activities of the organization." *Hussain v. Mukasey*, 518 F.3d 534, 538 (7th Cir. 2008); *see also Khan*, 766 F.3d at 698. We also note that "communications" is a form of material support delineated in the statute. Petitioner argues that his case is distinguishable from *Hussain* and *Khan* because his support was unrelated to LURD.

The BIA rejected this argument, reasoning that terrorist group leaders "often use social activities to network, to promote their organization, and to recruit new members or supporters." The *Hussain* and *Khan* courts employed a similar analysis in rejecting the petitioners' argument that supporting the peaceful arm of a terrorist group could not constitute material support. *See Hussain*, 518 F.3d at 538–39; *Khan*, 766 F.3d at 698. This reasoning has equal force here. The statute also makes clear that the material support bar prohibits the provision of material support not only to a terrorist organization, but also "to any member of such an organization." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). Therefore, the fact that Petitioner offered support to a LURD member rather than the organization itself is immaterial.

We note that the Supreme Court has taken a similarly expansive view of what constitutes material support in the context of the criminal statute banning material support to foreign terrorist organizations, stating that "[m]aterial support meant to promote peaceable, lawful conduct can further terrorism by foreign groups in multiple ways." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010) (internal quotation marks, alteration, and citation omitted). The Court observed that terrorist organizations systematically conceal their activities behind charitable, social, and political fronts. *Id*.

(citation omitted). "Indeed, some designated foreign terrorist organizations use social and political components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations." *Id*. at 30–31 (citation omitted). Accordingly, the Court found that "seemingly benign support" can constitute unlawful material support. *Id*. at 36.

In light of circuit and Supreme Court precedent, we find no error in the BIA's conclusion that Petitioner provided material support to LURD. This finding is fatal to Petitioner's applications for asylum and withholding of removal under both 8 U.S.C. § 1231(b)(3) and CAT. *See Khan*, 766 F.3d at 698. Consequently, we find that Petitioner is ineligible for asylum and withholding of removal.

### C.  Deferral of Removal under CAT

Petitioner offers a threadbare assertion that, at a minimum, he is entitled to deferral of removal under CAT. The BIA denied him this relief. Although we have determined that Petitioner is ineligible for asylum or withholding of removal, we may still determine whether Petitioner is entitled to deferral of removal under CAT. *See id.*; *see also* 8 C.F.R. § 1208.16(c)(4).

"We review the denial of CAT protection under the highly deferential substantial evidence test[.]" *Rashiah v. Ashcroft*, 388 F.3d 1126, 1131 (7th Cir. 2004) (citations omitted). We review the entire record as a whole and reverse "only if the record evidence *compels* a contrary conclusion." *Lenjinac v. Holder*, 780 F.3d 852, 855 (7th Cir. 2015) (emphasis added) (citations omitted). In order to receive CAT protection, the Petitioner has

the burden to demonstrate that "it is more likely than not that [the Petitioner] would be tortured if removed to [Liberia]." 8 C.F.R. § 1208.16(c)(2). "Torture is defined as the intentional infliction of severe pain or suffering for the purpose of coercion, punishment, or discrimination," but it does not include "lesser forms of cruel, inhuman or degrading treatment or punishment," or "suffering inherent to lawful sanctions imposed for violating the law." *Borovsky v. Holder*, 612 F.3d 917, 923 (7th Cir. 2010) (quoting 8 C.F.R. § 208.18) (quotation marks omitted). In addition, CAT protection requires evidence that the Petitioner will be tortured by the government, or with the government's acquiescence. *Khan*, 766 F.3d at 698.

Here, the BIA agreed with the IJ that the Petitioner did not show that it is more likely than not that he would be tortured if he was removed to Liberia, and therefore denied him relief. Although neither the BIA nor the IJ provided a robust analysis on this issue, we have no trouble concluding that their finding is supported by substantial evidence. It is clear that Petitioner simply rested on the evidence he offered in support of his asylum and withholding of removal applications to prove that he would be subjected to torture. The BIA noted that Petitioner failed to submit any evidence that he was subjected to torture in the past, or would likely be subjected to it should he be returned to Liberia. The IJ similarly found that the evidence submitted by Petitioner did not rise to the level of torture.

Importantly, record evidence indicates that country conditions have improved since the end of the civil war and its aftermath. There is no indication that the government or its agents have committed arbitrary or unlawful killings. The 2010 State Department Human Rights Report states that Mandingo

Muslims hold political office and have not been targeted with violence. In short, the record lacks evidence to substantiate Petitioner's professed fear of torture. Therefore, we agree with the BIA and the IJ's conclusion that Petitioner has not met his burden to establish eligibility for protection under CAT. As a result, Petitioner is not entitled to deferral of removal.

### D.  Petitioner's Remaining Arguments

We briefly turn to Petitioner's remaining arguments on the merits of his asylum and withholding of removal applications. Specifically, Petitioner contends that the BIA erred in its conclusion that he failed to demonstrate both past and future persecution in support of his asylum and withholding of removal applications. However, due to the applicability of the material support bar as an alternative basis for finding ineligibility for asylum and withholding of removal, we need not delve further into this argument. *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (collecting cases) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach."); *see also Achacoso-Sanchez v. INS*, 779 F.2d 1260, 1263 (7th Cir. 1985).

Similarly, it would be futile to analyze Petitioner's argument that the BIA erred in affirming the IJ's adverse credibility determinations. The adverse credibility determinations go toward the merit of Petitioner's asylum and withholding of removal applications. Therefore, any analysis regarding errors in the BIA's adverse credibility determinations would be purely academic. Furthermore, the adverse credibility determinations did not impact our finding that Petitioner had not met his burden of establishing eligibility for deferral of removal

under CAT. The denial of deferral turned on the lack of torture-specific evidence, not the BIA's adverse credibility determinations. Accordingly, we decline to address Petitioner's remaining arguments.

### III. CONCLUSION

For the foregoing reasons, Petitioner's petition is DENIED and the BIA's decision is AFFIRMED.

HAMILTON, *Circuit Judge*, concurring in part and concurring in the judgment. I agree that Jabateh's petition should be denied and that the Board lacked jurisdiction to review Jabateh's "section 13" application. See 8 U.S.C. § 1255b. I would deny the rest of his petition on the merits. That would require only a straightforward application of our deferential standard of review to factual findings. Jabateh simply did not prove that if he returns to Liberia, he faces persecution based on his religion, ethnicity, or any other protected ground, or that he faces a likelihood of torture. Deciding the case on these grounds would avoid the difficult "material support of terrorism" issue. See *INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (courts and agencies are generally not required to make findings on issues not needed to support result).

Since my colleagues reach the issue of "material support of terrorism," I should explain my disagreement with their view and my agreement with the immigration judge. The occasional translation services Jabateh provided during Conneh's medical appointments and a few unspecified social occasions did not amount to "material support" of terrorism. LURD qualifies as a so-called Tier III terrorist organization, see 8 U.S.C. § 1182(a)(3)(B)(vi)(III), one not formally designated as such. I will assume for purposes of argument that Jabateh's translation services provided "support" to a member of that organization. Through a chain of statutory definitions, that translation support can amount to "terrorist activity." See 8 U.S.C. § 1182(a)(3). I agree with the immigration judge that Jabateh's sporadic and largely unpaid "support" in the form of personal translation for Conneh was not "material."

Aliens who have provided material support to a terrorist organization or a member of a terrorist organization are not eligible for important forms of immigration relief, including asylum, withholding of removal, and protection under the Convention Against Torture. See 8 U.S.C. § 1158(b)(2)(A)(v) (ineligible for asylum); 8 U.S.C. § 1231(b)(3)(B)(iv) (ineligible for withholding of removal); 8 C.F.R. § 1208.16(d)(2) (ineligible for withholding under Convention Against Torture); but see 8 C.F.R. § 1208.17(a) (eligible for deferral of removal under Convention Against Torture); *Khan v. Holder*, 766 F.3d 689, 698 (7th Cir. 2014) (eligible for deferral of removal under Convention Against Torture after showing "that the alien will be tortured *by the government* or with its acquiescence") (emphasis in original).

The Board's and the majority's broad construction of the statutory phrase "material support" effectively reads "material" out of the statute. It also fails to take account of the broader structure of the Immigration and Nationality Act. Under the broad reading we may well bar people we should be welcoming to the United States, people who have managed to escape some of the most chaotic and dangerous places in the world.

To begin with the statutory text, the critical language is buried in 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd), which is a clause of a definition of "engage in terrorist activity":

> As used in this chapter, the term "engage in terrorist activity" means, in an individual capacity or as a member of an organization—to commit an act that the actor knows, or reasonably should know, affords *material support*, including a safe house, transportation, communications,

> funds, transfer of funds or other material finan-
> cial benefit, false documentation or identifica-
> tion, weapons (including chemical, biological,
> or radiological weapons), explosives, or train-
> ing—to a terrorist organization described in [8
> U.S.C. § 1182(a)(3)(B)(vi)(III)], *or to any member
> of such an organization*, unless the actor can
> demonstrate by clear and convincing evidence
> that the actor did not know, and should not rea-
> sonably have known, that the organization was
> a terrorist organization.

Under this definition, a prohibited form of "support" for
Conneh, who was a member and leader of LURD, can amount
to support for terrorism—if it was "material support."

The Board and majority reason in essence that the statu-
tory list includes "communications" as a form of "material
support" and that translation between languages is a form of
communications, so Jabateh's sporadic and largely unpaid
help for Conneh with translation at his medical appointments
amounted to material support for terrorism. Also, because the
support need not be tied directly to terrorist acts, *Hussain v.
Mukasey*, 518 F.3d 534, 538 (7th Cir. 2008), the Board and ma-
jority reason that supporting Conneh in his personal endeav-
ors meets the material support bar.

This reasoning seems to me a little too mechanical and
sweeps too broadly. It loses sight of two key principles of stat-
utory interpretation: first, avoid interpretations that reduce
some statutory terms to surplusage (here, "material"), and
second, interpret statutory language with an eye toward its
broader statutory context and purpose. See, e.g., *Williams v.
Taylor*, 529 U.S. 362, 404 (2000); *King v. Burwell*, 576 U.S. —,—

, 135 S. Ct. 2480, 2489 (2015); Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167, 174 (2012) ("whole-text" and "surplusage" canons).

"Material" is a common term in federal law. It conveys some sense of both importance and relevance. For example, misrepresentations or omissions concerning issuance, purchase, or sale of securities may be unlawful if they are "material" but not if they are immaterial. See, e.g., 15 U.S.C. §§ 77k and 77*l*; 17 C.F.R. § 240.10b–5. Criminal fraud, such as in the federal statutes on mail, wire, bank, and tax fraud and fraud on the government, requires that the deception be "material." See *Neder v. United States*, 527 U.S. 1, 16, 22–25 (1999).

The standard for materiality is not always high, but it does exist. It calls for courts and agencies to distinguish the minor from the material. In fraud cases, it requires that the deception involve something that has "a natural tendency to influence" or is "capable of influencing" the relevant decision. *Id.* at 16, quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995), quoting in turn *Kungys v. United States*, 485 U.S. 759, 770 (1988); see also TSC *Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."). In fraud cases, materiality filters out the trivial or minor. See *TSC Industries*, 426 U.S. at 463 (reversing summary judgment for plaintiff; omissions not material, at least as a matter of law, so materiality presented factual dispute).

In other statutory contexts, materiality requirements are even more substantial. For instance, the False Claims Act uses a similar definition of material: "having a natural tendency to influence, or be capable of influencing, the payment or receipt

of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court recently said that this "materiality standard is demanding." *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. —, —, 136 S. Ct. 1989, 2003 (2016) (materiality requirement not met when violation is "minor or insubstantial").

In *Universal Health Services*, the Court also pointed out the broader use of materiality in the common law. In tort law, a matter is material only "(1) '[if] a reasonable man would attach importance to [it] in determining his choice of action in the transaction'; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action,' even though a reasonable person would not." *Id.*, citing Restatement (Second) of Torts § 538, at 80. Similarly, in contract law, a common and important issue is whether a party's breach is "material," which may excuse the other party from further performance. See generally Restatement (Second) of Contracts §§ 237 and 241; *Canada Dry Corp. v. Nehi Beverage Co.*, 723 F.2d 512, 517 & n.3 (7th Cir. 1983).

Materiality also plays important roles in constitutional law. For instance, the Fourteenth Amendment's Due Process Clause forbids prosecutors from failing to disclose "material" exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1964). Omitted evidence is "material" when it "creates a reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 112 (finding no *Brady* violation, in part, because undisclosed evidence was not "material"); see also *Harris v. Thompson*, 698 F.3d 609, 627–28 (7th Cir. 2012) (*Brady* standard of materiality applies to compulsory process clause).

While the precise meaning of "material" depends on its context, it *always* has the effect of raising the threshold of the word it modifies. In all of these contexts, courts make clear that the word must be reckoned with. In fact, when "material" modifies a statutory term, it is often regarded as an express "requirement." See, e.g., *United States v. Seidling*, 737 F.3d 1155, 1158, 1160 (7th Cir. 2013) (discussing mail fraud statute's "materiality requirement" or "materiality element").

When the materiality requirement is *absent* from a statute, the Supreme Court takes notice and enforces the unmodified statutory term more literally.[1] The Court has used this approach with the Immigration and Nationality Act itself. In *Kungys v. United States*, the Court reviewed 8 U.S.C. § 1101(f)(6), which states that a person will not be considered of good moral character if she has "given false testimony for the purpose of obtaining benefits under this chapter." The Court held that the false testimony provision did *not* contain an implicit materiality requirement:

> On its face, § 1101(f)(6) does not distinguish between material and immaterial misrepresentations. Literally read, it denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization

---

[1] At times the Supreme Court has read an implicit materiality requirement into a statute that does not expressly contain one. For instance, when a statute contains a term with a well-established meaning in the common law, the Supreme Court turns to the history of the term to see if it contains an implicit materiality requirement. See *Neder*, 527 U.S. at 20-23.

> benefits. We think it means precisely what it
> says.

*Kungys*, 485 U.S. at 779–80. If the *absence* of the word "material" has such a significant impact in the Immigration and Naturalization Act, then its *presence* must mean something.

This approach is further bolstered by the statute's examples of material support, which are all activities that advance the goals of terrorism. They include providing "a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training." § 1182(a)(3)(B)(iv)(VI); see also *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 304 (3d Cir. 2004) (Fisher, J., dissenting) (arguing that "material" requires the support to be "relevant to the specified terrorist goal, terrorist persons, or terrorist organizations, which in sum means that the support must be relevant to terrorism"). These examples reinforce the plain-language reading that support is "material" when it is relevant to advancing terrorism.

At times the Board has considered whether Congress intended to include a "de minimis" exception in the "material support" bar but has left this question unanswered. See, e.g., *In re S–K–*, 23 I. & N. Dec. 936, 945 (BIA 2006). With respect, this is the wrong question. Congress included a materiality requirement in the statute. The question that the Board and we should be asking is about the scope of that requirement.

The reader of the majority opinion can fairly ask whether its approach leaves any meaning for the word "material," at

least if it treats as material support of terrorism Jabateh's occasional and largely unpaid translation for a leader's medical appointments and a few other unspecified social errands. Cf. *In re \*\*\**, 2009 WL 9133770 (BIA 2009) (non-precedential) (finding support for terrorist organization was not material where it consisted of about four dollars and a packed lunch, and distinguishing *In re S–K–*, where petitioner donated about $685 over eleven months to non-terrorist activities of group).

The majority's approach also loses sight of important signals from the statutory context and purpose of the "material support" bar. The INA was amended in 1990 to bar certain forms of immigration relief to those engaged in terrorist activities. See Immigration Act of 1990, Pub. L. No. 101–649, 104 Stat. 4978 (1990). This provision has been amended several times since then, most notably in the PATRIOT Act and the REAL ID Act. See USA PATRIOT Act, Pub. L. No. 107-56, § 411, 115 Stat. 272 (2001); REAL ID Act of 2005, Pub. L. 109-13, § 103, 119 Stat. 243, 306 (2005).

The INA strikes a balance of sorts for handling asylum-seekers who come from parts of the world where terrorist organizations are active or even ascendant. It tries to distinguish between those who perpetrate terror and those who suffer from it. We bar the former. 8 U.S.C. § 1182(a)(3)(B). We offer asylum and CAT protection to at least some of the latter. § 1158; 8 C.F.R. § 1208.16(c). This sorting creates tension. A door open too wide would admit perpetrators; a closed door would deny deserving asylum-seekers. As the material support bar has been construed, the door is just barely ajar. The majority's reading threatens to close it entirely.

The material support bar already encompasses a broad range of groups, people, and activities. Tier I and II terrorist

organizations are those officially designated by statute or otherwise. 8 U.S.C. § 1182(a)(3)(B)(vi). Tier III terrorist organizations are other, undesignated groups that prepare for, plan, or commit terrorist activity. § 1182(a)(3)(B)(vi)(III). "Terrorist activity" is defined as "any activity which is unlawful under the laws of the place where it is committed … and which involves … [t]he use of any … explosive, firearm, or other weapon or dangerous device … with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property." § 1182(a)(3)(B)(iii).

As one Board member put it: "Any group that has used a weapon for any purpose other than for personal monetary gain can, under this statute, be labeled a terrorist organization." *In re S–K–*, 23 I. & N. Dec. at 948 (Osuna, concurring) (applying law to Chin National Front, which opposed military dictatorship in Burma that U.S. government had condemned as illegitimate, and where Christian members of Chin minority had well-founded fear of being persecuted by Burmese dictatorship).[2] To call these results surprising is an understatement. For instance,

> DHS [has] conceded … that an individual who assisted the Northern Alliance in Afghanistan against the Taliban in the 1990s would be considered to have provided "material assistance"

---

[2] While the broader precedent of *In re S–K–* still stands, its application to the Chin National Front was later modified. In 2007, then-Secretary of Homeland Security Chertoff exercised his discretionary authority to create limited exemptions for the Chin National Front, the Chin National Army, and the Chin League for Democracy. See Exercise of Auth. Under Sec. 212(d)(3)(B)(i) of the Immigration and Nationality Act, 72 Fed. Reg. 9957 (Mar. 6, 2007).

> to a terrorist organization under this statute and thus would be barred from asylum. This despite the fact that the Northern Alliance was an organization supported by the United States in its struggle against a regime that the United States and the vast majority of governments around the world viewed as illegitimate.

*Id.* This broad definition could bar Syrians who provided support to those opposing the current Assad regime before fleeing their county. See Theodoric Meyer, *U.S. Is Arming Syrian Rebels, But Refugees Who've Aided Them Are Considered Terrorists*, ProPublica, https://www.propublica.org/article/us-is-arming-syrian-rebels-refugees-whove-aided-them-considered-terrorists (Sept. 30, 2013) (U.S. Citizenship and Immigration Services stated that "any Syrians who do apply for refugee or asylum status could be subject" to the material support bar). This is remarkable, given that the United States itself has supported select Syrian opposition groups. See Carla E. Humud et al., Congressional Research Service, *Armed Conflict in Syria: Overview and U.S. Response* 20–27 (2016).

As noted, we have interpreted the material support bar to include support for a terrorist organization's non-terrorist activities. See *Hussain v. Mukasey*, 518 F.3d 534, 538 (7th Cir. 2008) ("If you provide material support to a terrorist organization, you are engaged in terrorist activity even if your support is confined to the nonterrorist activities of the organization."); accord, *In re S–K–*, 23 I. & N. Dec. at 943–44. This is because some forms of support like money are fungible. Such support to a terrorist organization's non-terrorist activities frees up resources for its terrorist activities. *In re S–K–*, 23 I. & N. Dec. at 944. In addition, this type of support, even though

not directly supporting terrorist acts, may bolster a terrorist organization by giving it greater legitimacy or influence. Many terrorist organizations "operate on two tracks: a violent one and a peaceful one (electioneering, charity, provision of social services). If you give money (or raise money to be given) for the teaching of arithmetic to children in an elementary school run by [a terrorist organization], you are providing material support to a terrorist organization even though you are not providing direct support to any terrorist acts." *Hussain*, 518 F.3d at 538.

In addition, duress does not seem to be an available defense for an asylum-seeker who provided material support to a terrorist or terrorist organization. See *Matter of M–H–Z*, 26 I. & N. Dec. 757, 760 (BIA 2016) (collecting cases from several circuits). People who are threatened or coerced by terrorists into providing material support will likely be barred from immigration relief.

As Board Vice Chair Osuna wrote in his concurrence in *In re S–K–*, therefore, "the statutory language is breathtaking in its scope." 23 I. & N. Dec. at 948. For example, the government took the position at oral argument in this case that the material support bar would apply to a doctor or nurse who provided emergency medical care to a person she "should have known" was affiliated with a group that uses violence. Given the Board's approach to duress in *M–H–Z*, the bar would apply even if she provided the medical care at gunpoint. Really?

If the Board and the courts apply the material support bar so broadly to non-terrorist activities and even to support provided under duress, it is especially important to give meaning to the statutory limit of "material." That term calls for immigration judges, the Board, and the courts to strike a balance

written into the Act. It does so by preventing application of the bar to people arriving in the United States from some of the most dangerous and chaotic places on earth. They may not have been able to avoid all contact with terrorist groups and their members, but we should not interpret the statute to exclude on this basis those who did not provide "material" support to them.

Many deserving asylum-seekers could be barred otherwise. For example, the grocer who sells groceries to a known rebel fighter who is shopping for dinner would be providing support to terrorism. The taxi driver, the plumber, the dentist—anyone who has even minor commercial contact with a known terrorist, even in a setting that does not advance the goals of a terrorist organization—has supported terrorism. This broad approach could bar people simply because the places they have escaped from are ones where terrorists were active. Congress opted against that blanket approach.

At oral argument the government attempted to minimize this concern by raising the possibility of discretionary relief under 8 U.S.C. § 1182(d)(3)(B). Such relief is possible, and DHS has issued several group-based and situational-based exemptions under this provision. See, e.g., *supra* at 30 n.2 (group-based exemptions for Chin groups); Exercise of Auth. Under Sec. 212(d)(3)(B)(i) of the Immigration and Nationality Act, 79 Fed. Reg. 6913 (Feb. 5, 2014) (permitting limited exemptions for "insignificant material support" of terrorism).

The possibility of discretionary relief elsewhere in the statute does not change the plain language of the statute. We do not read the "materiality" requirement out of the criminal fraud statutes because there is the possibility of a presidential pardon. Nor should we do so here. "Material" should have

some meaning. Also, as a practical matter due to the way § 1182(d)(3)(B) has been implemented, some applicants are precluded from even being considered for this form of discretionary relief and most will receive no judicial review of that decision.[3]

To back its broad reading of "material support," the majority also relies on the Supreme Court's interpretation of that phrase in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010).

---

[3] In *FH-T v. Holder*, 743 F.3d 833 (7th Cir. 2013), we addressed why some petitioners are precluded from relief under § 1182(d)(3)(B). DHS will consider an exemption only for a petitioner who has been deemed "otherwise eligible" for immigration relief. See *id.* at 843, citing U.S. Citizenship and Immigration Services, *Fact Sheet* (Oct. 23, 2008). As a result, if the Board affirms an immigration judge's finding that a petitioner is barred due to material support of terrorism but does not proceed to address the merits, DHS will not consider an exemption. It's a catch-22: the petitioner may be "unable to seek a waiver [from DHS] because no final finding of asylum eligibility 'but for the bar' has been issued [by BIA], and unable to receive a full adjudication of asylum eligibility [from BIA] on the basis that he is subject to the material support bar." *Id.* at 843; see also *FH-T v. Holder*, 743 F.3d 1077 (7th Cir. 2014) (Wood, C.J., dissenting from denial of rehearing *en banc*).

Congress "expressly provided for federal judicial review over exemption determinations," 743 F.3d at 847, yet many petitioners will be precluded from receiving this review due to interagency timing problems. This is because DHS will consider providing an exemption only *after* an order of final removal. The Board's removal order, however, triggers a 30-day window for the petitioner to seek federal judicial review. Since "it is unlikely that Congress intended DHS waiver decisions *themselves* to constitute separately reviewable decisions," we noted that the "current agency practices will in all likelihood frustrate the opportunity for review because the Board decisions will issue more quickly than DHS exemptions (and the period for appealing a removal order will otherwise lapse)." *Id.* at 847–48.

Ante at 17–18. That decision makes clear that truly material support for terrorism can include support for non-terrorist activities of terrorist organizations, but it did not address any issue of the minimal limits to materiality. The Court wrote that "'Material support' is a valuable resource by definition." 561 U.S. at 30. The value that Jabateh's translation services for Conneh's medical appointments and other social matters might have had to LURD's terrorist activities is not at all clear. Indeed, Jabateh was generally unpaid, only occasionally receiving "a few dollars, a few francs." App. at 12 n.5.

The challenging question is of course what level of support meets the threshold of materiality. Identifying the "material" floor may be difficult, but such is the nature of judicial line-drawing. See *Bank of Markazi v. Peterson*, 578 U.S. —, —, 136 S. Ct. 1310, 1336 (2016) (Roberts, C.J., dissenting) ("I readily concede, without embarrassment, that it can sometimes be difficult to draw the line between legislative and judicial power."). The statute's use of the word "material" requires such a line. As we review specific immigration cases such as Jabateh's, just as in fraud cases, we should not shy away from this judicial task. See also *Basic Inc. v. Levinson*, 485 U.S. 224, 236 n.14 (agreeing that "materiality concept is judgmental in nature and it is not possible to translate this into a numerical formula" and should be assessed on a "case-by-case basis").

In Jabateh's case, three key factors lead me to find that the Board erred by holding his "support" was "material." First, and most important, Jabateh provided a very small amount of support. The translation service was sporadic and generally unpaid. App. 18. The arrangement appears to have been rather ad hoc: Jabateh was "called in sometimes" between 2001

and 2002 to translate during doctor appointments and social errands. *Id.* This went on "Just a few months." *Id.* at 13 n.6.

Second, Jabateh provided support only for Conneh's personal, non-terrorist activities. Jabateh testified, and the immigration judge found him credible, that he never interpreted for Conneh's business meetings or any events involving LURD. *Id.* at 12, 18. He was not translating battle commands, communicating with LURD confederates, or recruiting new members. Nor did he carry weapons or provide security for Conneh. *Id.* Also, the type of "support" he provided—translation during Conneh's personal outings—is not fungible like money, nor did it bolster LURD's legitimacy or influence.

Third, Jabateh provided translation services to a member of LURD, not to the organization itself. If Jabateh had been translating for LURD itself, even in LURD's non-terrorist capacity (such as a charitable arm of the organization), there would be a stronger case to consider the support "material." In such a case, his support might have been more relevant to advancing the goals of terrorism.

Here, the combination of these three factors leads me to conclude that the immigration judge was right and the Board erred by finding Jabateh's support was material. He provided a small amount of non-fungible services to a Tier III terrorist member in only his personal non-terrorist activities. If we treat that as material support of terrorism, we may bar too many people from dangerous parts of the world who had only minimal contact with the terrorist organizations in their midst. It would bar the doctor, nurse, grocer, taxicab driver, plumber, and dentist. That result is not consistent with the statute.